[No. H026867. Sixth Dist. Nov. 22, 2005.]

LOCKHEED MARTIN CORPORATION, Cross-complainant and Appellant,
v.
CONTINENTAL INSURANCE COMPANY et al., Cross-defendants and
Respondents.

**COUNSEL**

Howrey Simon Arnold & White, Curtis D. Porterfield, Stephen V. Masterson and William T. Um for Cross-complainant and Appellant.

Greve Clifford Wengel & Paras and Edward T. Clifford for Cross-defendant and Respondent Commercial Union Insurance Co., as successor in interest to Employers Surplus Lines Insurance Co., Employers Surplus Lines Insurance Co. and Stonewall Insurance Co.

Barger & Wolen, John C. Holmes and Jennifer S. Yu for Cross-defendants and Respondents AIU Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company and Old Republic Insurance Company.

Smith Ellison, Michael W. Ellison and Khai LeQuang for Cross-defendants and Respondents First State Insurance Company and Twin City Fire Insurance Company.

Sedgwick Detert Moran & Arnold and Roger W. Sleight for Cross-defendant and Respondent Allianz Underwriters Insurance Company.

Knapp, Petersen & Clarke and K. Stephen Tang for Cross-defendant and Respondent Associated Aviation Underwriters.

Berman & Aiwasian, Alan S. Berman, Steven P. Haskell and Bruce Telles for Cross-defendants and Respondents Central National Insurance Company of Omaha and Century Indemnity Company.

Berkes Crane Robinson & Seal, Steven M. Crane, Barbara S. Hodous; Alschuler Grossman Stein & Kahan, Frank Kaplan and Kenneth S. Meyers for Cross-defendants and Respondents Continental Insurance Company, Transcontinental Insurance Company and Continental Casualty Company.

Wiley Rein & Fielding, Laura A. Foggan, John C. Yang, Anthony E. Orr; Sinnott Dito Moura & Puebla, Randolph P. Sinnott and J. Karren Baker for The Complex Insurance Claims Litigation Association as Amici Curiae on behalf of Cross-defendants and Respondents Continental Insurance Company, Transcontinental Insurance Company and Continental Casualty Company.

## OPINION

**PREMO, J.**—In this insurance coverage matter, Lockheed Martin Corporation (Lockheed) seeks coverage under numerous policies for pollution-related liability totaling hundreds of millions of dollars. (See *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1444–1445 [75 Cal.Rptr.2d 54] (*Travelers*).) After 10 years of litigation, the trial court entered judgment for the insurers and Lockheed has appealed.

Lockheed raises five issues on appeal. The first three issues involve interpretation of certain comprehensive general liability (CGL) policies issued by Harbor Insurance Company for the period from January 1, 1969 through

March 1, 1978 (the Harbor policies). The Harbor policies are not standard form policies but are "manuscript" policies drafted especially for Lockheed. We hold that within the meaning of the particular policies at issue: (1) The duty to defend "any suit or action" does not obligate the insurer to defend administrative actions that have not ripened into lawsuits; (2) provisions that define "personal injury" as "wrongful entry" or "violation or infringement of property or contract rights" do not cover liability for pollution-related property damage; and (3) the term "accident" means "a sudden, unintended, and unexpected happening that is identifiable in time and place." Lockheed has the burden to prove that the property damage liability for which it seeks coverage was caused by an accident that took place during the policy period. Where nonaccidental property damage and accidental property damage exist at the same site, Lockheed has the burden to show that an appreciable amount of the damage, over and above that caused by nonaccidental means, was caused by accident.[1] On these points we agree with the trial court.

We also agree with the results of the challenged *Cottle* proceedings. (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367 [5 Cal.Rptr.2d 882] (*Cottle*).) Lockheed did not submit sufficient evidence to support a prima facie case for coverage under the Harbor policies of the pollution-related liability Lockheed incurred in connection with its Burbank facility.

We part company with the trial court on the fifth issue. We hold that based upon our decision in *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592 [98 Cal.Rptr.2d 277] (*Ludgate*), it was error to have sustained the demurrers of certain excess insurers (collectively, Excess Insurers).[2] For reasons we shall explain, the error does not warrant reversal but does require that we modify the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lockheed is an aerospace manufacturer with operations at many different locations throughout the country. At all relevant times Lockheed maintained a primary CGL policy and additional layers of excess insurance. From at least 1952 through the end of 1968, Lockheed obtained its primary and excess

---

[1] We granted the application of the Complex Insurance Claims Litigation Association to file an amicus curiae brief in support of the insurers on these issues.

[2] Excess Insurers refers to AIU Insurance Company, Allianz Underwriters Insurance Company, Associated Aviation Underwriters, Central National Insurance Company of Omaha, Century Indemnity Company, Commercial Union Insurance Company as successor in interest to Employers Surplus Lines Insurance Company, Employers Surplus Lines Insurance Company, First State Insurance Company, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, Old Republic Insurance Company, Stonewall Insurance Company, and Twin City Fire Insurance Company.

insurance coverage from Certain Underwriters at Lloyd's of London and other British insurance companies (collectively, the London Insurers). Harbor issued Lockheed's primary CGL policies from 1969 through 1978.[3]

Beginning in the 1980's, the United States Environmental Protection Agency (EPA), the California Regional Water Quality Control Board (Water Board), and environmental agencies in other states identified Lockheed as responsible for contamination of the soil and groundwater at a number of locations. Some of the contaminated sites were hazardous waste disposal sites such as the Stringfellow Acid Pits in Southern California where Lockheed, along with other companies, had routinely disposed of hazardous waste. Other sites were storage yards or research, development, and manufacturing facilities such as the Burbank site where Lockheed had manufactured airplanes for over 60 years. The environmental agencies ordered Lockheed to participate in the investigation and remediation of pollution at all these sites. In addition, the United States and some private individuals sued Lockheed for damages related to contamination at several of the locations.

In 1993, as Lockheed's potential liability was mounting, Leslie Walpole Procter filed this case on behalf of the London Insurers, seeking a declaration that pollution claims were not covered under their policies. Lockheed filed a cross-complaint against the London Insurers and against numerous other insurance companies, including Continental Insurance Company (Continental), the successor in interest to Harbor. The operative pleading is the fifth amended and supplemental cross-complaint filed in March 1997, which seeks declaratory relief and damages for breach of contract and bad faith related to environmental claims at 13 different sites. The pleading estimates that Lockheed's liability for contamination at these 13 sites will exceed $500 million.

Given the size and complexity of the case, the trial court organized it into phases. In phases II and IV, issues of law were tried to the court. Phase III was to have been a jury trial of Lockheed's indemnity claims, but, prior to trial, the trial court conducted a hearing pursuant to *Cottle, supra,* 3 Cal.App.4th 1367, requiring the parties to produce evidence to support a prima facie case on every issue for which the party had the burden of proof. Lockheed was unable to produce sufficient evidence to satisfy the trial court that it could prove its claim for coverage of the Burbank contamination. As a result, the trial court excluded the evidence. This ruling presaged the dismissal of all of Lockheed's indemnity claims.

---

[3] The six primary CGL policies at issue are: No. 107080 (Jan. 1, 1969 to Jan. 1, 1970); No. 108380 (Jan. 1, 1970 to Jan. 1, 1971); No. 110142 (Jan. 1, 1971 to Mar. 1, 1972); No. 112314 (Mar. 1, 1972 to Mar. 1, 1975); No. 121010 (Mar. 1, 1975 to Mar. 1, 1977); and No. GLA010438 (Mar. 1, 1977 to Mar. 1, 1978).

The trial court's orders on these and other dispositive motions, combined with a collection of stipulations, disposed of the matter.[4] The court incorporated its prior orders into a final judgment entered October 22, 2003. Lockheed has timely appealed.[5]

## II. DISCUSSION

### A. *Rules of Interpretation and Standard of Review*

■ The first three issues before us involve the interpretation of the Harbor policies. Our standard of review is well settled. "The interpretation of an insurance contract, as with that of any written instrument, is primarily a judicial function. [Citation.] Unless the interpretation of the instrument turns upon the credibility of conflicting extrinsic evidence, a reviewing court makes an independent determination of the policy's meaning." (*Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].)

In conducting our independent review, we apply the equally well-settled rules governing interpretation of insurance contracts. The fundamental rule is that interpretation of an insurance contract, like any contract, is governed by the mutual intent of the parties at the time they form the contract. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The parties' intent is found, if possible, solely in the contract's written provisions. (*Id.* at p. 822.) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation." (*Ibid.*) If a layperson would give the contract language an unambiguous meaning, we apply that meaning. (*Ibid.*)

■ Ambiguity exists when a policy provision is reasonably susceptible of two or more interpretations. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) "The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact

---

[4] During the course of the litigation, Lockheed reached settlements on some or all issues with a number of defendants, including the London Insurers. The London Insurers are not parties to this appeal.

[5] Lockheed separately appeals from the trial court's postjudgment order denying in part Lockheed's motion to tax costs claimed by Continental. (*Lockheed Martin Corp. v. Continental Ins. Co.* (H027381, app. pending).)* We ordered the two appeals considered together for purposes of oral argument but will issue our decisions separately.

that a word or phrase isolated from its context is susceptible of more than one meaning." ' [Citation.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*).) In other words, ambiguity is not an abstract question. We consider the whole instrument and the circumstances of the case. (*Ibid.*) Although a word may have several meanings, " 'You have to consider the sentence in which it stands to decide which of those meanings it bears in the particular case, and very likely will see that it there has a shade of significance more refined than any given in the wordbook.' " (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737 [15 Cal.Rptr.2d 815] (*Shell Oil*), quoting Holmes, *The Theory of Legal Interpretation* (1899) 12 Harv. L.Rev. 417.)

█ In deciding whether an ambiguity exists, the court may consider extrinsic evidence. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641].) The trial court must provisionally receive the extrinsic evidence in order to determine whether the language of the contract is "reasonably susceptible" of the interpretation contended. (*Id.* at p. 40.) If the court decides after considering the evidence that the language of the contract in light of all the circumstances is fairly susceptible of either of the two interpretations argued by the parties, there is an ambiguity and the extrinsic evidence becomes relevant to prove the meaning. (*Ibid.*) If the court decides that the language of the agreement is not reasonably susceptible of the interpretation urged by the party offering it, there is no ambiguity and the extrinsic evidence is irrelevant and therefore inadmissible. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].)

█ One additional rule is that if "a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent." (*Bartlome v. State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1239 [256 Cal.Rptr. 719].) We apply this rule with caution, first determining whether the context in which the construed term appears is analogous to the context of the term before us. For example, in the instant case it will be important to remember that the Harbor policies are manuscript policies. They are not standard form policies such as those commonly used, at least as a starting point, for most general liability policies today. (See *Golden Eagle Ins. Co. v. Insurance Co. of the West* (2002) 99 Cal.App.4th 837, 846, fn. 4 [121 Cal.Rptr.2d 682].) Prior judicial construction of a term in a

standard form policy will be helpful only so long as the term appears in a context analogous to its context in the policy before us.

### B. *The Duty to Defend "Any Suit or Action"*

#### 1. *Background*

■ Toward the end of 1998 Lockheed filed motions for summary adjudication of the issue of whether certain of the Harbor policies required the insurer to defend Lockheed in connection with Water Board orders directing Lockheed to clean up pollution at the Sunnyvale, Redlands, and Burbank sites. The Supreme Court had recently held that the insurer's duty to defend the insured in a "suit seeking damages" under a standard CGL insurance policy was limited to lawsuits prosecuted in a court. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 878–888.) The Water Board orders are concededly not part of any lawsuit but are administrative orders issued pursuant to statute. (Wat. Code, § 13304, subd. (a).) The Harbor policies in question apply the duty to defend to "any suit *or action* . . . alleging and seeking damages." (Italics added.) Lockheed argued that the phrase "any suit or action" is broader than the phrase construed by *Foster-Gardner* and that the term "action" encompasses administrative actions like the Water Board orders. The trial court agreed and granted the motions.

In 2001, while this case was still being litigated, the Supreme Court decided *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine I*). *Powerine I* involved the duty to indemnify found in the same standard CGL policy interpreted by the court in *Foster-Gardner.* (*Id.* at p. 950.) *Powerine I* held that the duty to indemnify for all sums the insured was " 'legally obligated to pay as damages' " was limited to sums ordered by a court as opposed to expenses required by an administrative agency pursuant to an environmental statute. (*Id.* at p. 951.) Since the Harbor policies apply the duty to defend to any suit or action "seeking damages," Continental asked the trial court to reconsider its summary adjudication orders in light of *Powerine I.* The trial court granted reconsideration and reversed its prior orders.

#### 2. *Analysis*

The question before us is whether the five Harbor policies covering the period from January 1, 1969 through March 1, 1977 require the insurer to defend administrative proceedings that have not ripened into lawsuits filed in a court. The language in each of the policies is identical in all relevant parts. The defense clause provides that the insurer shall: "defend in his name and behalf *any suit or action* against the Insured alleging and seeking damages on

account of such injury or alleging and seeking damages on account of the Insured's failure to perform his contractual obligations . . . ; but the [insurer] shall have the right to make such investigation, negotiation and settlement of *any claim, suit or action* as may be deemed expedient . . . ." (Italics added.)

We agree with Continental that the duty to defend "any suit or action" does not apply to the instant Water Board orders. But that is not because, as Continental argues, the phrase "any suit or action" is linked to the term "damages." As *Powerine I* recognized, although "damages" usually refers to money ordered by a court, orders to pay money made by administrative tribunals may also be viewed as "damages." (*Powerine I, supra,* 24 Cal.4th at p. 963.) In our view, the question is best analyzed by looking to the common understanding of the word in the context of the policies as a whole.[6]

■ The policies in question distinguish between the duty to defend any suit or action and the right to investigate, negotiate, or settle "any claim, suit or action." It is conceded that "suit" means lawsuit and that "claim" means something short of a lawsuit. The question, therefore, is whether "action" means some third thing. According to Lockheed it refers to administrative actions. But we find such a construction unreasonable. As the court in *Foster-Gardner* observed, an administrative order is generally considered to be in the nature of a claim. (*Foster-Gardner, supra,* 18 Cal.4th at p. 888.) If we were to construe "action" to refer to administrative proceedings we would create an ambiguity where none presently exists. That is, if "action" means "administrative action," must the insurer defend the universe of administrative regulations, inquiries, and orders with which an insured might have to contend, or are some of those activities merely claims that the insurer may settle when expedient?

■ The only reasonable interpretation of the term "action," as it is used in the policies before us, is that it refers to a civil action prosecuted in a court. In what is known as the "no action" clause, the policies provide that unless the insured's liability is finally determined by judgment or written agreement, "no action" will lie. As commonly understood, that means no lawsuit may be filed. The policies also state that no person has the right "to join the Company as a codefendant in any *action* against the Insured" but that nothing prevents the insured from "maintaining an *action* against the Company to determine the company's liability under this policy." (Italics added.) By joining the term "codefendant" with the term "action," this provision demonstrates the parties' understanding that "action" means a lawsuit. Parties

---

[6] Indeed, the Supreme Court has recently held that the language of Powerine's excess policies is broad enough to include coverage for the liability of environmental cleanup costs ordered by an administrative agency. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 385 [33 Cal.Rptr.3d 562, 118 P.3d 589].)

are not commonly referred to as defendants in other types of proceedings. Further, an action against the insurer to determine its liability under the policy plainly contemplates an action for declaratory relief, i.e., an action in a court of law.

■ We observe that the statutory definition of "action" is "an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (Code Civ. Proc., § 22.) Witkin devotes an entire chapter to *Actions*. (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, ch. IV.) In discussing the definition of the term, Witkin notes, "so far as *civil actions* are concerned [citation], an 'action' means the same thing as a 'suit.' " (3 Witkin, Cal. Procedure, *supra*, Actions, § 11, p. 64.)

Lockheed argues that if we construe the word "action" to mean the same thing as "suit" the word becomes surplusage, a result the canons of interpretation instruct us to avoid. Continental suggests that since "actions at law" and "suits in equity" once had very different meanings, use of both terms made certain that the duty to defend would extend to both types of court proceedings. This is a plausible explanation for the apparent redundancy.

■ At one time the word "suit" was used to refer to proceedings in equity; an "action" was a proceeding at law. (*St. James Church v. Superior Court* (1955) 135 Cal.App.2d 352, 358–359 [287 P.2d 387].) Although California and most other jurisdictions long ago abolished the procedural distinction between actions at law and suits in equity, differences between the two types of proceedings continue to be relevant. (See, e.g., *Nibler v. Dept. of Transportation* (2005) 338 Or. 19 [105 P.3d 360, 361].) Where a policy provides for a defense, we presume that a reasonable insured would expect a defense without regard to the law/equity distinction. Since the common understanding of both words in the context of these insurance polices is that they refer to proceedings in court, it is entirely reasonable to construe the phrase "any suit or action" as referring to all proceedings in court, both suits in equity and actions at law.

In sum, we find no ambiguity in the phrase "any suit or action." The phrase unambiguously applies to proceedings in court and does not encompass administrative proceedings that do not involve a lawsuit.

C. *The Accident-based Policies*

1. *Background*

In phase II the trial court was called upon to decide whether the Harbor policies covering the period 1969–1975 were "accident-based" or

"occurrence-based." The pertinent language in each of the four policies is the same. Under a section labeled "Insuring Agreements" is the following: "[Insurer agrees to] pay on behalf of or reimburse the Insured for all sums and losses which the Insured shall become legally obligated to pay or bear, either as damages or otherwise, and either directly or by set-off or counter claim, because of injury, sustained by any person or organization." Further down in the same section is the statement: "This policy applies only to occurrences wherever occurring during the policy period."

The declarations page has two columns, one labeled "COVERAGE" and the other labeled "LIMIT OF LIABILITY." Coverage is described as "Personal Injury and Property Damage Liability." Liability limits are "FIVE MILLION DOLLARS *each accident.*" (Italics added.)

The definition of "accident," which appears elsewhere in the policies, is this: "The words 'accident' and 'accidents' with respect to Personal Injury Liability shall include occurrence and occurrences."

The trial court summarized its rulings on the accident issues as follows:

"The CGL policies . . . issued by Harbor Insurance Company between January 1, 1969 and January 1, 1975 [*sic*, should be March 1, 1975] (the 'accident based policies'), provide coverage for property damage liability on an accident basis. Under these policies, the insured can only obtain coverage for property damage resulting from an accident that happened during the policy period.

"An accident is a sudden, unintended, and unexpected happening that is identifiable in time and place. In this context, 'sudden' means 'quick' or 'abrupt.' For coverage to exist under an accident-based policy, the event that caused the damage must have been sudden, unintended and unexpected. There can be no coverage under an accident-based policy for damage arising from gradual causes or from deliberate waste disposal practices.

"For coverage to exist under an accident-based policy, the accident and the immediately-resulting damage must have happened during the period of that policy. Under an accident-based policy, there is no coverage for damage that did not result from a sudden, unintended and unexpected event during the period of that policy. Property damage from an accident can only be covered by policies in one policy period, because the required sudden event could only happen during one policy period.

"In seeking coverage under an accident-based policy, Lockheed has the burden of proving that claimed property damage resulted from an accident during the policy period."

Beginning in 1971, the Harbor policies contained exclusions for pollution-related damage unless the damage was caused by a "sudden, unintended and unexpected happening" or was "sudden and accidental." This type of exclusion is commonly known as a qualified pollution exclusion. (See *Travelers, supra,* 63 Cal.App.4th at p. 1448.) The trial court held, in connection with these policies: "If Lockheed claims that pollution was caused by a sudden, unintended, and unexpected happening during the policy period, and other pollution resulted from gradual or deliberate cause, Lockheed must prove that a sudden, unintended and unexpected discharge must have caused an appreciable amount of contamination over and above the contamination caused otherwise." The trial court later held that this ruling applied as well to the 1969 and 1970 accident-based policies that did not contain the qualified pollution exclusion.

Lockheed argues that each of the foregoing rulings is erroneous.

### 2. *Analysis*

#### a) *The Burden of Proof*

Lockheed contends that the court erred in concluding that Lockheed had the burden to prove that the damage for which it was seeking coverage was caused by accident. Lockheed claims that, given the way these policies are written, in order to avoid coverage, the insurer has the burden to prove that the damage-causing event was *not* an accident.

The general rule is that the insured bears the burden to establish that the act or event forming the basis of its claim falls within the basic grant of insurance coverage. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188 [77 Cal.Rptr.2d 537, 959 P.2d 1213] (*Aydin*).) Once an insured has made this showing, the insurer has the burden to prove that the claim is specifically excluded. (*Ibid.*) Some of the cases citing this rule refer to the fact that the basic grant of coverage is found in the policy's *insuring agreement* or the *insuring clause.* (E.g., *American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1325 [284 Cal.Rptr. 45].) Lockheed argues that because the policies' reference to "accident" does not appear in the section labeled "Insuring Agreements," "accident" does not describe a basic grant of coverage. The argument is too literal an application of the rule.

As Lockheed correctly asserts, the insurer bears the burden of proving exclusions regardless of where in the policy the dispositive language is found. " '[I]t is the *function* served by policy language, not the location of language in an insurance policy, that is determinative.' " (*Dart Industries, Inc. v.*

*Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1071 [124 Cal.Rptr.2d 142, 52 P.3d 79], quoting *Aydin, supra,* 18 Cal.4th at p. 1191.) We analyze the insured's burden the same way, considering the function served by the policy language, not the location of the words themselves. Thus, although the term "accident" does not appear in the section labeled "Insuring Agreements," it does not necessarily follow that "accident" is a limitation upon the basic grant of coverage. On the other hand, since the event insured against is usually described in the insuring clause, the placement of the term "accident" elsewhere in the instant policies does give rise to some ambiguity.

Continental introduced extrinsic evidence to support its contention that, even though the term "accident" did not appear in the insuring agreement, the basic grant of coverage for property damage liability was for injuries caused by accidents. We find, as the trial court did, that the extrinsic evidence amply supports Continental's position.

The unusual structure of the policies can be traced at least as far back as 1952 to the primary CGL policy issued by the London Insurers. On its declarations page, that policy lists the limit of liability for bodily injury as $1 million "each occurrence" and the limit for property damage liability as $1 million "each accident." The section containing the insuring agreement is worded almost identically to the corresponding section in the Harbor policies. The format and language of the 1956 primary CGL policy was the same as the 1952 policy except that it had a combined single limit for bodily injury and property damage of $2 million "each accident" and defined "accident" to mean "occurrence" when the word was applied to bodily injury liability. In language and structure this 1956 policy is identical to the instant Harbor policies in all pertinent parts. Correspondence generated at the time the earlier policies were issued shows that Lockheed understood that "accident" referred to the basic grant of coverage.

Lockheed had wanted both property damage and bodily injury coverage to be written per "occurrence" but the London Insurers refused. The 1952 primary policy was described in a letter from Lockheed's stateside broker, Paul Schaffner: "We have had extensive correspondence with [Sedgwick][7] . . . with respect to the use of the word 'occurrence' instead of 'accident' in connection with the Property Damage Liability coverage. . . . [¶] With respect to this insurance we proposed a definition of the word occurrence to Underwriters as it would apply to Property Damage Liability; however, they still are not agreeable to cover Property Damage on an occurrence basis."

[7] Sedgwick, Collins & Co. Limited was Lockheed's London broker.

The 1952 excess policy was similar to the 1952 primary policy except that it had a combined single limit for both types of injury. In a letter describing this policy Schaffner stated: "We have always provided that the Property Damage coverage under the insuring agreement afforded is 'because of accidental injury to or destruction of property, including the loss of use thereof.' " He went on to report that the brokers had again requested coverage for property damage on an occurrence basis but that Underwriters still refused. "In this respect [Underwriters] have required that under the limit of liability . . . we refer to accident instead of occurrence in the first paragraph. We then are defining accident to read as follows: [¶] 'as respects bodily injury the words "accident" and "accidents" shall be deemed to include occurrence and occurrences.' " (Italics added.) Schaffner explained that the definition of "accident" was "necessary because the insuring agreement combines both Bodily Injury and Property Damage Liability under a single limit."

Schaffner revisited the issue in 1956: "As you know, we have consistently for years attempted to obtain Property Damage on an unlimited occurrence basis. We have just as consistently been denied the use of this term by Underwriters." The leading underwriter was "disturbed in learning that you are not satisfied with the coverage which has been afforded under the existing wording [i.e., use of the word accident]." (Italics added.) If Lockheed were to insist upon substituting "occurrence" for "accident" a "complete replacement of the insurance" would be necessary.

All of this demonstrates that the parties understood that the basic coverage grant in the policies issued by the London Insurers was either accident-based or occurrence-based. Indeed, prior to 1966, the typical liability policy was written to cover only accidents. (See *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 562 [334 P.2d 881] (*Geddes*); and see Rosenkranz, *The Pollution Exclusion Clause Through the Looking Glass* (1986) 74 Geo. L.J. 1237, 1241–1243.) The term "accident" described the type of event that must happen for coverage to be triggered. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 671 [42 Cal.Rptr.2d 324, 913 P.2d 878].)

It is true that occurrence-based coverage was assumed to be broader than accident-based coverage, which is why Lockheed had tried for years to obtain property damage coverage on an occurrence basis. But the word "accident" as used in the instant policies does not reflect, as Lockheed now suggests, a limitation upon a broader, overall coverage provision. It is clear that the result of the 1952 discussions with the insurer was that a different scope of coverage was provided depending upon the type of injury suffered. Since the instant Harbor policies were drafted in the same format and contained the

same wording as the earlier policies, it is reasonable to assume that Lockheed understood at the time that they supplied the same type of coverage.

Notwithstanding this evidence, Lockheed contends that the term "accident" is not a coverage provision at all but merely "link[s] multiple occurrences by defining a single causative limit." Lockheed's argument is based upon a discussion in *Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th at page 672 concerning the use of the word "accident" in a post-1966 occurrence-based CGL policy. In 1966, the insurance industry changed the standard CGL policy from an "accident-based" to an "occurrence-based" format. (*Ibid.*) The change evolved out of the difficulties faced by courts and parties in dealing with damage sustained as a result of gradual processes. The occurrence-based CGL policy retained the term "accident" within its definition of occurrence in order to clarify that only one accident or occurrence is intended as far as the application of policy limits is concerned. (*Ibid.*) Use of the term in this manner in the form policy is inapplicable to analysis of the policies before us.

We conclude that the basic grant of coverage for property damage contained in the Harbor policies issued between January 1, 1969 and March 1, 1975 is for damage caused by accident. Accordingly, Lockheed has the burden to prove its losses were caused by accident.

### b) *Definition of Accident*

We next consider Lockheed's contention that the trial court erred in defining "accident" to include the attribute of suddenness. Lockheed's position is that "accident" refers to an unforeseen or unexpected happening but that it does not necessarily have to occur suddenly. We find no error in the trial court's definition.

In 1959, the California Supreme Court construed the word "accident" to include the element of suddenness. (*Geddes, supra,* 51 Cal.2d 558.) *Geddes* involved the failure of doors installed in the insured's buildings. The policy at issue covered losses " 'caused by accident.' " (*Id.* at p. 562.) In concluding that the door failures were accidents the court explained: "No all-inclusive definition of the word 'accident' can be given. It has been defined 'as "a casualty—something out of the usual course of events and which happens suddenly and unexpectedly and without design of the person injured." [Citations.]' [Citation.] It ' "includes *any event which takes place without the foresight or expectation of the person acted upon or affected by the event."* ' [Citations.] 'Accident, as a source and cause of damage to property, within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown

cause.' [Citation.] The door failures were unexpected, undesigned, and unforeseen. They were not the result of normal deterioration, but occurred long before any properly constructed door might be expected to wear out or collapse. Moreover, they occurred suddenly. It bears emphasis that we are concerned, not with a series of imperceptible events that finally culminated in a single tangible harm [citation], but with a series of specific events each of which manifested itself at an identifiable time and each of which caused identifiable harm at the time it occurred. . . . [E]ach door, when it failed, failed suddenly. At one moment it was a usable door, at the next it was not." (*Geddes*, *supra*, 51 Cal.2d at pp. 563–564.)

Courts have continued to define "accident" as having an element of suddenness. For example, *Shell Oil*, *supra*, 12 Cal.App.4th at page 751 cited *Geddes* in approving a jury instruction that defined "accident" as something that " 'happens suddenly and unexpectedly' " and " 'occurs in a spontaneous, instantaneous, abrupt or immediate manner.' " Our Supreme Court has noted that "an 'accident' in the literal sense" is "a sudden precipitating event." (*Montrose Chemical Corp. v. Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 672.)

Lockheed's only argument in contradiction is that the parties' claims history (consisting of two cases) shows their understanding that "accident" could be a nonsudden event. The first case is the Van Nuys lawsuit, which was filed in the 1950's by property owners who claimed that Lockheed had been "continuously engaged in making test and experimental flights of jet and other airplanes" and that the flights caused "tremendous noise" that interfered with the use and enjoyment of plaintiffs' property and caused them "great disturbance and nervous upset." The London Insurers provided a defense and covered the resulting liability. Schaffner referred to the claim in his 1956 letter. In explaining the insurer's refusal to provide property damage coverage on an occurrence basis he stated: "Sedgwick's advise [the leading underwriter] is well aware that the Van Nuys airport claims were the sort of claims which would bring 'occurrence' into the picture if ever any claim did. They point out that no questions were raised by the Underwriters on these claims and they understand that Lockheed was extremely pleased with the cooperative attitude of the Underwriters on these claims."

The Abacherle claim, which was filed in 1978, was styled as a complaint for property damage, emotional disturbance and personal injuries, and inverse condemnation resulting from Lockheed's operation of the Hollywood-Burbank Airport. The plaintiffs' injuries were allegedly caused by "noise, vibrations, soot [and] fumes of jet aircraft" flying into and out of the airport. The London Insurers and Harbor defended the claim, reserving their rights to deny coverage. The case was ultimately dismissed and in a written release of claims Lockheed acknowledged that the insurers had not admitted coverage.

These two claims do not support Lockheed's argument. An insurer is bound to provide a defense where there is the potential for coverage. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766].) This is not a recent concept. (See *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275, fn. 15 [54 Cal.Rptr. 104, 419 P.2d 168], citing cases from the 1950's and 1960's.) Both the Van Nuys and the Abacherle plaintiffs alleged injuries that were arguably covered as personal or bodily injury. Therefore, the carriers probably had a duty to defend these claims even if the allegations pertaining to property damage did not meet a caused-by-accident requirement. Furthermore, the reference to the Van Nuys lawsuit in Schaffner's letter implies that the continuous or gradual cause of the injuries suffered in that case was *not* what would be considered an "accident." Finally, two claims filed over a decade apart do not amount to a pattern of claims handling.

We conclude that the *Geddes* definition is applicable to the policies before us. The policies at issue use the word "accident" in its literal sense, as did the policy interpreted by the *Geddes* court. In both cases the policies cover losses caused by accident. The trial court's definition of "accident" as "a sudden, unintended, and unexpected happening that is identifiable in time and place" is consistent with this judicial construction of the term.

### c) *The Trigger of Coverage*

According to Lockheed, the trial court erroneously imposed a "double anchor" trigger of coverage when it ruled that the "sudden causal event and the immediately resulting damage must happen during the policy period." Lockheed argues that it is only the resulting damage that triggers coverage. Lockheed misconstrues the trial court's ruling.

It is true that a prior wrongful act that ultimately causes an accident does not usually trigger coverage. (E.g., *State Farm Mut. Auto. Ins. Co. v. Longden* (1987) 197 Cal.App.3d 226, 232 [242 Cal.Rptr. 726] [no coverage where insured's negligent maintenance of vehicle occurred during policy period but accident resulting in injury happened after policy expired].) However, that is not the issue here. The trial court's statement of decision explains: "For coverage to exist under an accident-based policy, the accident and the immediately resulting damage must have happened during the period of that policy." That is, the "sudden causal event" is not some prior negligence that might have led to the damage; it is the accident itself.

The trial court's ruling is based upon the plain meaning of the instant policies, which apply to "occurrences wherever occurring during the policy period." The occurrence that is required for property damage coverage

is an accident. Thus, the accident must occur *during the policy period* in order to trigger coverage. The ruling is consistent with the general rule that the time of the occurrence of an accident within the meaning of a CGL policy is the time when the complaining party was actually damaged. (*Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 88 [295 P.2d 19].) When the damage is caused by an accident, i.e., a sudden precipitating event, the accident itself triggers coverage because damage results immediately.

It bears repeating that the instant policies are *not* the standard, post-1966 occurrence-based policies in which "occurrence" is defined as " ' "an accident, *including injurious exposure to conditions*, which results, *during the policy period, in bodily injury and property damage.*" ' " (*Montrose Chem. Corp. v. Admiral Ins. Co., supra*, 10 Cal.4th at p. 672.) Coverage is triggered under the post-1966 policies when an injury is suffered during the policy period. The change to occurrence-based coverage in these policies altered the requirement of the earlier accident-based policies that the accident itself must occur during the policy period in order to trigger coverage. (*Id.* at pp. 672–673.) The instant policies are examples of the earlier, accident-based policies. They require an accident, i.e., the sudden causative event, to occur during the policy period.

### d) *Damage Caused by Accidental Means*

The trial court ruled: "If Lockheed claims that pollution was caused by a sudden, unintended, and unexpected happening during the policy period, and other pollution resulted from gradual or deliberate cause, Lockheed must prove that a sudden, unintended and unexpected discharge must have caused an appreciable amount of contamination over and above the contamination caused otherwise." Lockheed argues that the trial court erred in extending its "over and above" ruling to the policies that do not contain a pollution exclusion clause and to applying it to Burbank, which was not a hazardous waste disposal site. We disagree on both points.

This court held in the *Travelers* case that where pollution has resulted from routine dumping of polluting materials at a dumpsite, a sudden and accidental intervening event could trigger coverage under a policy containing a qualified pollution exclusion so long as the insured could show that the sudden and accidental event caused an appreciable amount of the environmental damage. (*Travelers, supra*, 63 Cal.App.4th at p. 1460.) The holding reflects simple contract law. The insurer had contracted to cover pollution claims only if the polluting discharge had been sudden and accidental. In a case where some damage has been caused by noncovered events, the first step in the insured's proof sequence is to show that there is damage resulting from a covered event, i.e., damage over and above that which is not covered under the policy.

The absence of a pollution exclusion clause does not change the fact that Lockheed must prove its claim is covered under the pertinent policies. The accident-based policies do not cover pollution-related property damage, or any other type of property damage, *unless* the damage was caused by accident. Although in insurance parlance this is not an "exclusion," the effect of the scope of coverage is that it excludes all nonaccidental property damage claims. Lockheed cannot prove its case if it cannot show damage over and above that which was caused by nonaccidental means.

 Nor does it matter that the nonaccidental damage might have been caused by routine manufacturing practices rather than by intentional dumping. If it was not an accident, it is not covered. A series of imperceptible events that finally culminate in a single harm is not an accident. (Cf. *Geddes, supra,* 51 Cal.2d at p. 564.) An accident is a specific event that manifests itself at an identifiable time and causes identifiable harm at the time it occurs. (*Ibid.*) Thus, contamination caused gradually by routine practices, intentional or not, is not caused by accident within the meaning of these policies and the insurer has no obligation to indemnify Lockheed for the resulting liability.

The trial court did not err in ruling that where there is property damage arising from nonaccidental sources, in order to obtain coverage under the 1969 and 1970 accident-based policies, Lockheed must be able to prove that some amount of its property damage liability was caused by a sudden and unexpected event or events identifiable in time and place. If Lockheed cannot prove that there was covered damage over and above the amount that is not covered, Lockheed cannot prove its indemnity claim.[8]

D. *Coverage for Personal Injury*

The Harbor policies define personal injury as, among other things, "wrongful entry" or "violation or infringement of property or contract rights."[9] Lockheed argues that pollution claims fall within this definition of personal

---

[8] Of course, the insured must also prove what amount or proportion of its resulting liability was caused by the covered events. (See *Golden Eagle Refinery Co. v. Associated Internat. Ins. Co.* (2001) 85 Cal.App.4th 1300, 1316–1317 [102 Cal.Rptr.2d 834] (*Golden Eagle*).) We discuss the causation and damages elements in part E below.

[9] These policies define "personal injury" to include:

"(i) bodily injury, mental injury, mental illness or disease, mental anguish, shock or disability, or

"(ii) malpractice, or

"(iii) libel, slander, humiliation, defamation, discrimination, or piracy, or

"(iv) false arrest or imprisonment, wrongful eviction, wrongful entry, unlawful detention, or malicious prosecution, or

"(v) any violation or infringement of property or contract rights, or

"(vi) any violation or infringement of personal rights or rights of privacy or copyright."

injury. Since the 1969 and 1970 policies do not contain a pollution exclusion clause, Lockheed contends that pollution-related claims should be covered under the occurrence-based personal injury provisions of these two policies.

As Lockheed argues, many cases have held that "[i]n the world of liability insurance policies, coverage for 'personal injury' liability depends not primarily on the type of *injury* sustained, but whether the injuries arose from the commission of certain *offenses*." (*Titan Holdings Syndicate v. City of Keene, N.H.* (1st Cir. 1990) 898 F.2d 265, 270; see also *Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 499 [20 Cal.Rptr.2d 376]; *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1032–1033 [123 Cal.Rptr.2d 256].) In this case, however, coverage does depend upon the type of injury suffered.

The 1969 and 1970 Harbor policies differentiate between property damage and personal injury and apply a different scope of coverage to each type of injury. Property damage claims are covered on an accident basis. Personal injury claims are occurrence-based. If we were to decide that the occurrence-based personal injury coverage applied to property damage, this distinction would be meaningless. A property damage claim that was not the result of an accident but was caused by some gradual process would still be covered. But that is precisely what the policies do not cover. Furthermore, given Lockheed's repeated unsuccessful attempts to obtain property damage coverage on an occurrence basis, Lockheed cannot reasonably have believed that the occurrence-based personal injury provisions would apply to property damage claims.

In holding that the personal injury coverage does not apply to the pollution-related property damage claims, the trial court relied upon a series of three appellate cases each of which construed policies containing pollution exclusion clauses. (*Titan Corp. v. Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457 [27 Cal.Rptr.2d 476] (*Titan*); *Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472 [42 Cal.Rptr.2d 101] (*Legarra*); *Union Oil Co. v. International Ins. Co.* (1995) 37 Cal.App.4th 930, 936 [44 Cal.Rptr.2d 4] (*Union Oil*).) These cases rejected the insureds' arguments that the policies' personal injury coverage applied to pollution-related property damage claims because such an interpretation would effectively nullify the pollution exclusion. (*Titan, supra,* 35 Cal.App.4th at p. 474; *Legarra, supra,* 35 Cal.App.4th at pp. 1485–1486.) *Union Oil* pointed out that it was not objectively reasonable for an insured to expect " ' "personal injury" ' " to mean " ' "property damage" ' " or to expect that pollution claims would be covered when the policy contained a blanket pollution exclusion. (*Union Oil, supra,* 37 Cal.App.4th at p. 940.)

Lockheed argues that we should follow *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113 [47 Cal.Rptr.2d 670], which held that personal injury coverage for " 'wrongful entry or eviction, or other invasion of the right of private occupancy' " in a policy that did not contain a pollution exclusion could extend to claims for pollution-related injury. (*Id.* at p. 1117.) In our view, the absence of the pollution exclusion clause in *Martin Marietta* is what distinguishes it from this case. Without a pollution exclusion clause to consider, the *Martin Marietta* court did not have to concern itself with rendering another part of the policy meaningless. Here, even though there is no pollution exclusion to consider, we must give effect to the policies' distinction between property damage coverage and personal injury coverage. If we were to interpret the policies as providing occurrence-based personal injury coverage for pollution-related property damage that was not caused by accident, we would effectively nullify that distinction.

We conclude that the only reasonable construction of the occurrence-based personal injury coverage for "wrongful entry" or "violation or infringement of property . . . rights" is that it applies to injuries other than injury to property.

### E. *The* Cottle *Proceedings*

#### 1. *Introduction*

Prior to the phase III trial of Lockheed's indemnity claims, the trial court ordered the parties to produce evidence sufficient to make a prima facie showing for each issue upon which the party had the burden of proof at trial. (See *Cottle, supra,* 3 Cal.App.4th 1367.) In its effort to prove its claim for coverage of the Burbank contamination, Lockheed submitted evidence of 14 accidents it claimed resulted in the release of pollutants at Burbank. After reviewing the evidence the trial court concluded that it was insufficient to prove a prima facie case. The trial court held that a large part of Lockheed's evidence was inadmissible and that, even if all the evidence had been admissible, it was insufficient and therefore, as permitted by *Cottle,* the court excluded the evidence.

Lockheed argues that the trial court's preliminary evidentiary rulings were erroneous, that the court improperly weighed the evidence, and that the evidence was sufficient to support a prima facie case for indemnity. We shall first consider whether the evidence is sufficient to support a prima facie case. If it is not, we need not reach Lockheed's other arguments.

#### 2. *Standard of Review*

*Cottle* held that a trial court may use its inherent powers to manage complex litigation by ordering the exclusion of evidence if the plaintiff is

unable to establish a prima facie case prior to the start of trial. (*Cottle, supra,* 3 Cal.App.4th at p. 1381.) A *Cottle* hearing is in the nature of a motion for nonsuit in that the court tests the sufficiency of the evidence without regard to conflicting evidence the opposing party may present. In evaluating a nonsuit motion, the trial court may not weigh the evidence or consider the credibility of witnesses, but must accept as true the evidence most favorable to the plaintiff, indulging every legitimate inference in the plaintiff's favor. (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1313 [37 Cal.Rptr.2d 541].) On review, a judgment of nonsuit is not reversible if the plaintiff's proof raises nothing more than speculation, suspicion, or conjecture. Reversal is warranted only if there is some substance to the plaintiff's evidence upon which reasonable minds could differ. (*Ibid.,* citing *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838–839 [206 Cal.Rptr. 136, 686 P.2d 656].) We apply the same rules in our review of the court's assessment of the evidence presented in connection with the *Cottle* proceedings.

### 3. *Evidence*

#### a) *Background*

Burbank was an aerospace research and development and manufacturing facility that Lockheed operated from approximately 1928 until the early 1990's. It was a large site of over 300 acres. During the time Burbank was in operation, Lockheed produced more than 30,000 airplanes and missiles there. About half of all the airplanes manufactured at Burbank were manufactured before or during World War II.

By 1986, soil and groundwater contamination at the Burbank site caused the EPA to include it within two Superfund sites. According to the operative pleading, Lockheed expects that the environmental claims and suits related to contamination at Burbank will result in a liability, exclusive of defense costs, of more than $250 million, about as much as Lockheed expects to incur in connection with the 12 other sites put together.

During the *Cottle* proceedings, Lockheed submitted evidence of 14 accidents that it claimed took place at Burbank between 1967 and 1980. All of the alleged accidents involved the discharge of the chlorinated solvent perchloroethylene (PCE).

#### b) *The Accident Evidence*

All of the accidents Lockheed described involved the escape of PCE from Lockheed's vapor degreasers. Degreasers are large pieces of equipment used

to clean airplane and machine parts. The parts are placed inside a large tank where the solvent is heated to form a vapor that condenses upon the cooler machine parts. The condensed solvent drips back into the degreaser tank and the cleaned parts are removed from the degreaser and washed with water. The rinse water and any accumulated solvent drain into a concrete pit beneath the degreaser.

The first nine alleged accidents involved leaks of the steam coils associated with the degreasing equipment. With minor exceptions, all the evidence of steam coil leaks is contained in a compilation of work orders maintained by L. Rawlings, Inc., a mechanical contractor that provided maintenance and repair services to Lockheed during the relevant time period. For example, one repair order states: "Repair steam leaks, on an emergency basis in Bldgs. 63-93-61, & 80, all as per instructions, also repair leak in condensate tee all as directed." A work order purporting to represent a separate accident states simply: "Rebuild degreaser and still."

Other evidence of steam coil leaks is contained in the statements of former Lockheed employees. One employee recalled an occasion "where the steam coils within the building 93 degreaser boiling chamber ruptured. The steam coil rupture completely emptied the boiling chamber of solvent." Another employee stated: "I definitely remember working on coils on that degreaser. Whether they were cooling coils or heating coils, I cannot be sure."

Three former employees described accidents involving a hole in the degreaser tank itself. One employee stated: "In approximately January, 1971, I recall having seen a crack or tear in the bottom of the building 93 degreasing tank. I was informed by another Lockheed employee that the crack had been caused by a part or basket containing parts being dropped into the bottom of the degreaser's vapor chamber." A second employee recalled being told of a similar accident in the late 1970's or early 1980's. The third employee testified that he knew of one occasion where solvent had leaked out of the degreasing tank. He never actually saw the spill; he had been apprised of the situation by the maintenance department.

Of particular interest is the testimony of Eric Winston who stated that, during his employment with Lockheed, he was aware that all the degreasers leaked. He stated: "Some degreasers would show signs of loss of fluid, which generally took place as a result of a heating coil leak. After replenishing the fluid, then we would monitor. If it showed signs of a low fluid or PCA— PCE, excuse me . . . then we would shut the degreaser off, drain it, have maintenance look at it." According to Winston all the degreasers had "periodic problems." He personally observed one leak in the building 69 degreaser but did not know how much PCE escaped.

In a series of declarations based upon the foregoing evidence, Lockheed's experts opined that a rupture of the parts cleaning tank would have resulted in the release of 1,500 to 2,000 gallons of PCE and a rupture of the steam pipes would have released from approximately 75 to 1,432 gallons per accident depending upon where the rupture occurred and how much solvent there was above the pipe. Lockheed experts also provided opinions about the approximate volume of PCE that would have migrated through the bottom of the concrete pits into the soil below and the speed with which it would have reached the groundwater.

In addition to the steam coil and tank ruptures described above, Lockheed alleged that on three occasions the degreaser in building 175 was damaged when the pit beneath it filled with water, causing the degreaser tank to float, which ruptured the pipes that transported the solvent. According to Lockheed, each such incident resulted in the discharge of about 1,000 gallons of PCE that, in turn, was pumped into the adjacent clarifier where it seeped through the floor of the clarifier into the ground below. At least one and possibly two of these alleged accidents occurred outside the pertinent policy periods.

The insurers submitted volumes of evidence in opposition. There are numerous reports pertaining to the Burbank cleanup efforts, excerpts from depositions of Lockheed's witnesses, and selections from Lockheed's responses to written discovery requests. Also included is a declaration of Lockheed's expert, Roger Minear, prepared in connection with earlier proceedings in the case. In that declaration, Minear stated: "Experience has shown historically that where there are vapor degreasers in use, there is soil and groundwater contamination with the particular solvent used . . . . This has proved to be the case even for exemplary operations. . . . [W]hen investigations in later years have been conducted, contamination is discovered at places where no spills are remembered and operational procedures would indicate contamination should not have occurred. [¶] . . . Knowledge generated in the last 20 years has demonstrated that the vapor degreasing solvents that were previously believed to be insoluble in water and so volatile that they would evaporate instead of contaminating soil and ground water do in fact have properties that lead to such contamination. The ability of these solvents to pass through concrete containers more readily than water is now a matter of professional experience."

Minear explained that prior to 1968, trichloroethylene (TCE) was the solvent used in Lockheed's degreasers. After that time PCE was used instead. Both solvents are heavier than water. As Minear explained, in the degreaser pits, "any accidentally spilled pure solvent will drop to the bottom of the sump beneath the water where it will be pumped out first when the pump activates. If the pumping process is delayed or the pump leaves some residual

liquid behind, the solvent has an opportunity to penetrate through the bottom of the sump into the underlying soil."

### 4. *Analysis*

In *Travelers, supra*, 63 Cal.App.4th at page 1460, we held that a sudden and accidental intervening event could trigger coverage for pollution-related property damage but, "the insured must do more than point to possible intervening events, such as a fire, to support a claim for coverage under the sudden and accidental exception. [Citations.] The insured must show that the intervening event was sudden and accidental and did not arise from the disposal of wastes in the ordinary course of business. [Citation.] The insured must also show that an appreciable amount of environmental damage was caused by the intervening event, over and above that caused by routine dumping into the disposal site." Lockheed argues that since Burbank was not a waste disposal site, it was Continental's burden to show that there was nonaccidental pollution at Burbank and unless it did so, Lockheed had no burden to prove there was accidental pollution "over and above" that caused by other means. The argument is, at best, disingenuous.

It is clear that there is or was substantial pollution at Burbank other than that which can be attributed to 14 PCE spills. The extent of the contamination may be inferred from Lockheed's own pleading, which describes the fact that in 1986 the Burbank site was included in parts of two Superfund sites. Furthermore, the insurers produced substantial uncontradicted evidence to show that contamination had been caused by nonaccidental means and by contaminants other the PCE. Minear's declaration supports the conclusion that PCE spills were a routine event and not accidental. According to the expert, even where no one can recall having spilled the solvent, later tests have found PCE in the soil and groundwater underlying the areas where it was used.

There was also evidence of contamination caused by substances other than PCE. Reports describing the Burbank cleanup efforts indicate that by 1989 significant soil contamination had been uncovered at five locations on the Burbank campus. PCE was discovered near two buildings, waste material and debris were found at an abandoned waste disposal site, and petroleum hydrocarbons and unspecified volatile organic compounds were found at two other locations. According to Lockheed's 1996 discovery responses, approximately 5,770 gallons of PCE and 1,180 gallons of TCE had been removed from the soil and groundwater at Burbank. The amount remaining on the property was unknown at the time.

It is also beyond dispute that contamination of the Burbank site began long before 1968. TCE, which Lockheed had not used after 1968, was one of the principal groundwater contaminants discovered in the 1980's. In a 1993 statement to a congressional subcommittee investigating the cleanup efforts, one Lockheed executive explained: "The contamination at Burbank is believed to have occurred over a long period of time, beginning before World War II."

The record before the trial court amply supports the conclusion that there was contamination at Burbank that was not attributable to Lockheed's 14 alleged accidents. Therefore, it was Lockheed's burden to prove that sudden and accidental intervening events caused contamination over and above that caused otherwise. Furthermore, it was not enough to show simply that some volume of toxic material was accidentally spilled. As in any other contract claim, in order to prove its case Lockheed had to prove its damages. In Lockheed's indemnity claim, Lockheed's damage is not the toxic material on the ground. Lockheed's damage is the liability that the insurer has agreed to indemnify. Thus, Lockheed must be able to prove that it has incurred liability caused by the covered events. (*Golden Eagle, supra,* 85 Cal.App.4th at p. 1314.)

We first observe that the majority of the 14 accidents described do not amount to accidents within the meaning of these policies. The multiple alleged steam coil leaks were not sudden, unexpected events that caused identifiable harm at the time they occurred. There is no evidence of the size of any of these alleged leaks, the speed with which they were discovered, or the means employed to contain them. The Rawlings work orders do not reflect sudden, unexpected events. They merely reflect repairs. And even assuming that each repair was associated with a sudden rupture in the system, since there were at least seven such events within the space of just a few years they cannot have been unexpected. With the possible exception of the accidents involving the falling parts basket and the floating degreaser, none of the events were sudden, unexpected and unintended events that caused identifiable harm at the time they occurred. (Cf. *Geddes, supra,* 51 Cal.2d at p. 564.) At best, evidence of these events supports the conclusion that PCE spills happened fairly regularly as part of routine operations. Indeed, this is almost precisely what former employee Winston stated in his deposition. All the degreasers leaked. They were monitored for signs of solvent loss—an expected problem.

Other courts have rejected the characterization of similar events as sudden and accidental. For example, in *Quaker State Minit-Lube v. Fireman's Fund*

*Ins.* (10th Cir. 1995) 52 F.3d 1522, 1530 the appellate court held that contamination at a motor oil recycling facility (Ekotek) "resulted from years of storage practices and accidents with used oil that released pollutants into the soil, surface water, and groundwater. Based on the record before us, including the deposition testimony of former Ekotek employees, spills, leaks, accidents, and other mishaps with used oil were frequent and familiar occurrences at the Ekotek Site. Because the accidental spills, leaks, and other releases were routine and commonplace events which occurred during regular business operations at the Ekotek Site, the discharges cannot as a matter of law be considered 'sudden and accidental.'" (See also *Ray Industries, Inc. v. Liberty Mut. Ins. Co.* (6th Cir. 1992) 974 F.2d 754, 768; *Cincinnati Ins. v. Flanders Elec. Motor Service* (7th Cir. 1994) 40 F.3d 146, 154; *Sharon Steel v. Aetna Cas. and Sur.* (Utah 1997) 931 P.2d 127, 136.)

 Taken together, most of the events alleged in the evidence reflect an ongoing pattern of leaks and spills and *not* accidents for which coverage is provided under the instant policies. What remains are a handful of accidents, three or four at the most, that purportedly resulted in the release of 87 to 2,000 gallons of PCE each time. Assuming that each of these accidents actually occurred as described and that each resulted in the discharge of some measurable amount of PCE, the evidence is insufficient to support Lockheed's prima facie case because Lockheed did not link that release to the liability for which it seeks insurance coverage.

 "A claim for indemnity is a contract claim and causation and the amount of damages are essential elements of a prima facie case." (*Golden Eagle, supra,* 85 Cal.App.4th at p. 1316.) Thus, in order to obtain a judgment against Continental, Lockheed would have to prove the amount and the cause of its damages. Since even Lockheed recognizes that contamination at Burbank probably began before World War II, there is the possibility that the site had reached a level requiring remediation before any of the Harbor policies were issued. It is also possible that, notwithstanding the few accidents Lockheed arguably might be able to prove, given the contamination caused by nonaccidental means, the accidental releases did not affect Lockheed's ultimate financial burden. In either case, it would not matter that some amount of additional pollution reached the ground as the result of the falling parts basket or the floating degreaser incidents.

 The only way Lockheed could prove the causation and damages elements of its case is to prove that these accidents affected the investigation and cleanup costs for which Lockheed was liable. One way to do that is to show that these events resulted in increased migration or penetration of the

PCE contamination. "Such demonstration requires the identification, allocation, and quantification of the contamination in relation to its source." (*Golden Eagle*, *supra*, 85 Cal.App.4th at p. 1316.) Although Lockheed's experts estimated the amount of PCE that would have reached the soil and groundwater as a result of the accidents described, Lockheed made no attempt to show how these spills related to the overall contamination at the site. Indeed, Lockheed's 1994 discovery responses suggest that it could not do that. Insurers had asked Lockheed to provide its best estimate of the percent of the total cleanup costs at Burbank attributable to the cleanup of PCE. Subject to a number of objections, Lockheed responded: "Lockheed cannot separate such costs by the individual chemicals PCE, TCE, and DCE. PCE, TCE and DCE are all included in a category of chemicals called volatile organic compounds (VOC[s]). Lockheed's cleanup efforts relating to VOCs have been directed at VOCs as a group and not at individual VOCs. Through August 1994 Lockheed has spent approximately $5.9 million which can be attributed to treating VOCs found in soils at the BURBANK SITE. In addition, Lockheed has spent, through August 1994, approximately $54.4 million on investigation, decontamination and demolition activities relating to treating contaminants found in soils at the BURBANK SITE, but these expenses are not divisible in terms of treating VOCs or total petroleum hydrocarbons (TPH)."

In *Hyde Athletic Industries v. Continental Cas. Co.* (E.D.Pa. 1997) 969 F.Supp. 289, the court held that evidence of three sudden and accidental releases of chromium was insufficient to create an issue of fact regarding whether sudden and accidental releases caused the pollution damage for which the insured sought coverage. The insured had not addressed the other potentially hazardous substances at the site and had made no attempt to quantify the portion of the damage attributable to the accidental release of the chromium. The court refused to "engage in the microanalysis that would be required to separate the damage caused by the chromium from the damage caused by these other substances, or in the microanalysis required to determine exactly when a chromium release occurred in the context of cumulative, regular trash dumping." (*Id.* at p. 301; see *Travelers*, *supra*, 63 Cal.App.4th at pp. 1459–1460.) In the present case, Lockheed offered no evidence to show how much, if at all, the three or four PCE spills contributed to its overall liability. Absent such evidence, Lockheed cannot prevail at trial.

We conclude that the trial court did not err in ruling that Lockheed had not submitted sufficient evidence to support a prima facie case. Accordingly, we need not reach Lockheed's argument that the trial court's evidentiary rulings were erroneous or that the court improperly weighed the evidence because,

even crediting all of the evidence Lockheed submitted, it was not enough to prove its case at trial. Pursuant to *Cottle, supra,* 3 Cal.App.4th 1367, the trial court was justified in excluding the evidence.

F. *The Excess Insurers' Demurrers*

In the operative cross-complaint, Lockheed's claim against Excess Insurers was reduced to a single cause of action. The 30th cause of action for declaratory relief states: "An actual controversy exists as to the rights and duties of the parties under the Primary and Excess Policies in connection with the Burbank Site in that Lockheed contends, and seeks a declaratory judgment declaring that: [¶] (a) Each of the cross-defendant insurers issued one or more insurance Policies, as identified in Exhibit C hereto, obligating it to indemnify Lockheed against those Underlying Claims concerning the Burbank Site; [¶] (b) Each of the cross-defendant insurers has wrongfully refused, failed or disclaimed any responsibility to fulfill its obligations under its respective Policies to completely indemnify Lockheed against those Underlying Claims concerning the Burbank Site; and [¶] (c) Lockheed is entitled to complete indemnity from cross-defendants and to be reimbursed by and to receive payment from cross-defendants for all sums which Lockheed becomes legally obligated to pay in connection with the Burbank Site."

In May 1997, the trial court sustained demurrers by Excess Insurers and others, including Ludgate Insurance Company (Ludgate) to Lockheed's 30th cause of action. The trial court ruled that the 30th cause of action did not adequately allege actual exhaustion of the primary policies or that it was reasonably likely Lockheed would exhaust its primary coverage, which it would have to do in order to reach the excess policies. In reliance upon this ruling, Ludgate obtained judgment on the pleadings. This court reversed that judgment, bringing Ludgate back into the case. (*Ludgate, supra,* 82 Cal.App.4th at p. 613.)

For reasons that are not clear, the parties did not obtain a judgment or dismissal in favor of the excess insurers other than Ludgate, although the parties proceeded as if all of those insurers had been dismissed. After this court's decision in *Ludgate* was filed in 2000, the trial court heard argument on the question of whether the court should vacate its ruling on the other demurrers. The court concluded that *Ludgate* did not compel such a result. The matter became final with respect to Excess Insurers when final judgment was entered. Lockheed now argues that the trial court was incorrect in concluding that the *Ludgate* holding did not apply to the other demurrers.

As it applies to Excess Insurers, the final judgment is, in effect, a judgment on the pleadings. Review of such a judgment is subject to our independent review confined to the face of the pleading under attack. (*Vehicular Residents Assn. v. Agnos* (1990) 222 Cal.App.3d 996, 998 [272 Cal.Rptr. 216].) That pleading, Lockheed's fifth amended and supplemental cross-complaint, is the same pleading we considered in *Ludgate*.

In *Ludgate* we held that Code of Civil Procedure section 1060 (section 1060) does not require an insured to show a reasonable probability of exhaustion of its primary coverage before it may state a cause of action for declaratory relief against an excess insurer.[10] All that section 1060 requires is that there be an " 'actual controversy relating to the legal rights and duties of the respective parties . . . .' [¶] . . . [¶] . . . Facts showing exhaustion of the underlying limits merely establish the insured's right to recovery, not whether an actual controversy exists between the parties." (*Ludgate, supra,* 82 Cal.App.4th at pp. 605–606.) We explained that it was unnecessary and improper for the excess insurer to insist that Lockheed be able to plead exhaustion in order to state a cause of action for declaratory relief. As a general matter, "by moving for a judgment on the pleadings, Ludgate admitted, for purposes of that motion, all the material allegations in Lockheed's fifth amended complaint, including the allegation that 'an actual controversy exists [between Lockheed and Ludgate] as to the rights and duties of the parties under the Policies in connection with the Burbank Site.' " (*Id.* at p. 605.) Furthermore, since Ludgate was one of the insurers that had commenced this lawsuit, it had expressly admitted the existence of an actual controversy when it filed the original complaint. (*Ibid.*) Because Ludgate had admitted the existence of the requisite actual controversy, it could hardly show at the pleading stage that Lockheed had not stated a cause of action for declaratory relief.

Excess Insurers argue that they are positioned differently than Ludgate since they were not among the original plaintiffs and, therefore, had not made the same admission Ludgate had made in its pleading. Although that may be so, they each filed a demurrer, which, like a motion for judgment on the pleadings, admits all material factual allegations in the pleading. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].)

---

[10] Section 1060 states, in pertinent part: "Any person interested under a written instrument, . . . or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract."

Moreover, by insisting upon allegations of exhaustion, Excess Insurers confuse the substance of the declaration Lockheed seeks with its right to a declaratory judgment of some kind.

 To be entitled to declaratory relief the party need not establish a right to a favorable declaration. "A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the parties under a written instrument or with respect to property and requests that the rights and duties of the parties be adjudged by the court. [Citations.] If these requirements are met and no basis for declining declaratory relief appears, the court should declare the rights of the parties whether or not the facts alleged establish that the plaintiff is entitled to favorable declaration. [Citations.]" (*Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943, 947 [148 Cal.Rptr. 379, 582 P.2d 970].) "It is the general rule that in an action for declaratory relief the complaint is sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under a contract and requests that the rights and duties be adjudged. . . . If these requirements are met, the court must declare the rights of the parties whether or not the facts alleged establish that the plaintiff is entitled to a favorable declaration." (*Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 549–550 [305 P.2d 20], citation omitted.)

Strictly speaking, a demurrer is a procedurally inappropriate method for disposing of a complaint for declaratory relief. As Witkin observes: "[A] demurrer would leave the parties where they were, with no binding determination of their rights, to await an actual breach and ensuing litigation. This would defeat a fundamental purpose of declaratory relief, to remove uncertainties as to legal rights and duties before breach and without the risks and delays that it involves. In brief, the object of declaratory 'relief' is not necessarily a beneficial judgment; rather, it is a determination, favorable or unfavorable, that enables the plaintiff to act with safety. This theory has prevailed, and the rule is now established that the defendant cannot, on demurrer, attack the merits of the plaintiff's claim. The complaint is sufficient if it shows an actual controversy; it need not show that plaintiff is in the right." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading § 831, p. 289.) This is the concept that formed the basis for the decision in *Ludgate*. It applies to the Excess Insurers that are respondents here to the same extent it applied to Ludgate.

It does not follow, however, that where the trial court has erroneously sustained a demurrer to a complaint for declaratory relief the appellate court must reverse. If the appellate court's decision on the merits would necessarily result in a declaration unfavorable to the plaintiff, reversal would be an idle

act. The appellate opinion is in effect a declaratory judgment. (See *Haley v. L. A. County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 293 [342 P.2d 476].) The proper procedure is to modify the judgment to make that declaration and affirm the judgment as modified. (*Berkeley v. Alameda County Bd. of Supervisors* (1974) 40 Cal.App.3d 961, 974 [115 Cal.Rptr. 540]; *Teachers Management & Inv. Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438, 449 [134 Cal.Rptr. 523].) Since we affirm the trial court's ruling in favor of the primary insurer on each of the coverage issues, there is no potential that Lockheed will exhaust its primary coverage and reach the excess policies. We shall, therefore, modify the judgment to include an appropriate declaration.

III. DISPOSITION

The judgment of the trial court is modified as follows:

Page 3: All of the text in the lower box on page 3 (lines 16–27) under the heading titled, "III DEMURRERS AND MOTIONS TO STRIKE AS TO CERTAIN EXCESS INSURERS" is deleted.

Page 4: The text contained in lines 5 through 8 is deleted.

Page 9: Paragraph 6 is modified to read in full as follows:

"6. As to the Thirtieth cause of action in Lockheed's Cross-Complaint, Continental Casualty, Allianz Underwriters Insurance Company, AIU Insurance Company, Granite State Insurance Company of the State of Pennsylvania, Landmark Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New Hampshire Insurance Company, Old Republic Insurance Company, First State Insurance Company, Associated Aviation Underwriters, Century Indemnity Company, Central National Insurance Company of Omaha, Westport Insurance Corporation, Stonewall Insurance Company, Commercial Union Insurance Company, as successor in interest to Employers Surplus Lines Insurance Company, Employers Surplus Lines Insurance Company, Twin City Fire Insurance Company, and American Reinsurance Company, have and had no duty or obligation to indemnify Lockheed for any liability that Lockheed has incurred or may incur arising out of the sites identified in the Thirtieth cause of action, and that final judgment on the Thirtieth cause of action be, and hereby is, entered in favor of all of the foregoing listed parties and against Lockheed, and Lockheed's requested declarations with respect to the Thirtieth cause of action are denied."

As modified, the judgment is affirmed.

Respondent Continental shall have its costs on appeal. The parties shall otherwise bear their own costs.

Rushing, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 22, 2006, S140051. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.