54 Cal.Rptr.3d 343 (2006)
146 Cal.App.4th 851
STATE of California, Plaintiff,
v.
UNDERWRITERS AT LLOYD'S LONDON et al., Defendants.
State of California, Plaintiff and Appellant,
v.
Allstate Insurance Company et al., Defendants and Respondents.
No. E037627.
Court of Appeal of California, Fourth District, Division Two.
December 28, 2006.
As Modified January 12, 2007.
As Modified on Denial of Rehearing January 25, 2007.
*344 Cotkin, Collins & Ginsburg, Roger W. Simpson, David W. Johnson, Jr., Los Angeles; Bill Lockyer, Attorney General, Darryl L. Doke, Supervising Deputy Attorney General, Jill Scally, Deputy Attorney General; Law Offices of Daniel J. Schultz, Daniel J. Schultz; Anderson Kill & Olick, Robert M. Horkovich and Edward J. Stein, for Plaintiff and Appellant.
Gauntlett & Associates, David A. Gauntlett, Irvine, and Eric R. Little as Amicus Curiae on behalf of Plaintiff and Appellant.
Berkes Crane Robinson & Seal, Steven M. Crane, Los Angeles, Barbara S. Hodous; Nixon Peabody, Bruce E. Copeland, Alan S. Feiler, San Francisco; Berman & Aiwasian, Alan S. Berman, Steven P. Haskell; Riedl, McCloskey & Waring and Andrew McCloskey for Defendants and Respondents.
Wiley Rein & Fielding, Laura A. Foggan; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and John J. Moura, Los Angeles, as Amicus Curiae on behalf of Defendants and Respondents.
Certified for Partial Publication.[*]

OPINION
RICHLI, J.
This is a coverage dispute between the State of California (the State) and four of its liability insurers. The insurers are All-state *345 Insurance Company, Century Indemnity Company, Columbia Casualty Company, and Westport Insurance Corporation, to whom we shall refer collectively as Insurers. The dispute concerns whether Insurers are required to indemnify the State against liability for damage caused to third parties by the discharge of pollutants from the State's "Stringfellow Acid Pits" waste disposal site.
The trial court granted summary judgment in favor of Insurers, based on exclusions in their policies for liability based on pollution and on the discharge of pollutants into a watercourse. The State contends Insurers are estopped from asserting the pollution exclusion, and at any rate neither that exclusion nor the watercourse exclusion excludes coverage here. We reverse the summary judgment, because we conclude the record raised a triable issue whether the State sustained liability for discharge of pollutants that fell within the "sudden and accidental" exception to the pollution exclusion and did not fall within the watercourse exclusion.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. The Site

In 1956, the State opened a. Class I Hazardous Waste Site (Stringfellow Site) near Glen Avon in Riverside County. The State's geologist, who investigated the site to determine whether it was suitable, did no soil analysis; he assumed the site was underlain by impermeable rock and there was no water in the bedrock or granite.[1] In fact, there were two buried alluvial channels, and water was moving through bedrock that consisted of decomposed granite and broken rock. A Class I site had to be impermeable or underlain by unusable water.
The State designed the site, which included a concrete barrier dam eight feet high at the downstream (southern) boundary of the site, diversion' channels, and ponds. The State admits it negligently investigated, selected, designed, and supervised the construction of the site, failing to ensure adequate diversion channels and other safeguards to prevent or protect against heavy rains.
The Stringfellow Site operated for about 16 years. During that time, with the knowledge and consent of the State, more than 30 million gallons of liquid industrial wastes were deposited directly into urilined evaporation ponds at the site.

B. Discharges of Pollutants from the Site

1. Subsurface discharges

According to a report prepared by an expert for the State, by 1960 contaminants exited the subsurface of the site around the east and west ends of the concrete *346 barrier and through the fractured bedrock underneath the barrier. From the moment the contaminants left the site, the soils and groundwater became contaminated progressively farther downstream of the site due to the continuous motion of the groundwater to the southwest. Through at least the late 1980's, the plume of contamination was moving progressively farther from the site. As of the date of the report, July 2004, damage to the soils and groundwater downgradient of the site was ongoing.

2. 1969 discharge

For purposes of the summary judgment motion from which this appeal arises, the parties agreed to the following facts. According to rainfall records, it rained heavily in January and February of 1969, with nearly seven inches of rainfall in January and eight inches in February. Not later than March 17, 1969, a once-in-50-year rainstorm of some 20 inches inundated the site, causing the contaminants at the site to overflow into the surrounding environment, including the City of Glen Avon.
In November 1972, the State found contamination in the groundwater, and the site was closed. No later than January 1973, signs of leaking were observed at the site. The leakage was worse by 1975. A 1974 report by the State's chief geologist recommended (1) a hydraulic barrier to capture waste flowing out of the site in the subsurface, to protect groundwater; and (2) leveling the site and putting an impervious cap on it, to prevent overflow in case of rain.

3. 1978 discharges

By the beginning of the 1978-1979 rainy season, the recommended measures had not been taken. After heavy rains in early 1978, all of the ponds at the site were full. On March 5, 1978, they began to overflow. The State decided to make a "controlled discharge" of waste from the site. The waste from the controlled discharge went directly into Pyrite Creek and from there across a roadway, down a channel, across a street just below a school, and into the Santa Ana River.
Three days after the first controlled discharge, a section of the dam had given way and was moving, and there was a 50-foot crack in the dam as well. To prevent the failure of the dam, the State made another controlled discharge, again discharging waste directly into Pyrite Creek and affecting areas as much as six miles downstream from the site.
The two controlled discharges in March 1978 released more than one million gallons of rain-diluted waste into the environment. In addition, during later rains the contaminants in the downstream surface soils repeatedly migrated and further damaged the environment. By December 1979, the contaminant plume had reached a street in the adjacent community. The release of waste in 1978 would not have occurred if the State had installed the hydraulic barrier and cap.

C. The Federal Action

In 1983, the United States of America and the State brought a civil action in federal `district court (the federal action) against companies that had disposed of waste at the Stringfellow Site. (United States of America et ol v. J.B. Stringfellow, Jr., et al, supra, case No. CV83-2501 JMI, 1995 WL 450856.) The companies counterclaimed against the State for damages caused by progressive environmental contamination occurring at and emanating from the site. In September 1998, the court in the federal action held the State 100 percent liable for past and future costs of remediating the contamination *347 tion.[2] According to the State, the costs exceed $500 million. The State alleges it paid $99.4 million and received from the counterclaimants a waiver of an estimated $100 million in return for dismissing its appeal from the judgment in the federal action.

D. The Policies

After the site was closed, but before the 1978 discharges, the State purchased comprehensive general liability excess insurance policies from Insurers. The terms of the policies varied, but together they provided coverage from September 1976 to May 1978. Although the policies were purchased after the site ceased operations, Insurers have not argued for purposes of summary judgment or this appeal that there is no coverage for that reason. While the language of the policies varied, Allstate's, Century's, and Westport's were in the same form and said essentially the same thing. For convenience, in this opinion we will quote the policy issued by Allstate's predecessor, which is sufficiently representative of the other two policies for our purposes.
The coverage clause of the policy obligates the insurer "[t]o pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of liability imposed by law, including Chapter 1681 of the State of California Statutes of 1963, or liability assumed by contract, insofar as the State may legally do so, for damages, including consequential damages, because of direct damage to or destruction of tangible property (other than property owned by the Insured), including the loss of use thereof, which results in an Occurrence during the policy period."[3] An "Occurrence" is "an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in ... Property Damage neither expected nor intended from the standpoint of the Insured."
The policy also contains a "pollution exclusion." The exclusion states that the policy does not apply to damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land or the atmosphere, but this exclusion does not apply if such discharge, dispersal[,] release or escape is sudden and accidental." (Italics added.)[4] The Columbia policy also contains this exclusion, with the modification noted below.
Finally, the policy contains a "watercourse exclusion," which states: "It is further agreed that the Policy does not apply to Personal Injury or Property Damage arising out of the discharges, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, wate [sic] materials or other irritants, contaminants or pollutants into or upon any watercourse or body of water." The watercourse exclusion is set *348 forth in a separate paragraph and does not contain the exception for sudden and accidental discharges.
Columbia's policy differs from the standard policy in two ways that should be noted here. First, instead of the coverage clause quoted above, the Columbia policy merely states that the insurer will "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the underlying insurance" to which the policy is excess. "Loss" is defined as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable," minus certain deductions. The policy states it is excess to "Underwriters at Lloyds, London Policy # TBA," but there is no policy number filled in.
The parties stipulated that this copy of the Columbia policy was "the most complete evidence" of the policy that was available. The record contains no subsequent stipulation supplying the number of the underlying policy, nor does it contain a copy of the underlying policy. Therefore, we are unable to determine what, if any, effect the terms of the underlying policy might have on the coverage provided by the Columbia policy.[5]
The second difference between the standard policy and the Columbia policy is that the Columbia policy does not contain a separate paragraph setting forth the watercourse exclusion. Instead, the pollution exclusion provides that it also applies to discharges into or upon "any watercourse or body of water...." The effect is that Columbia's watercourse exclusion is subject to the same "sudden and accidental" exception as is the rest of its pollution exclusion.

E. The Present Action

The State filed the present action in September 2002. The operative complaint, the first amended complaint (hereafter the complaint), alleged claims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. Although the complaint named about 30 insurance companies, Insurers are the only defendants involved in this appeal.
In the complaint, the State alleged that it notified Insurers of the federal action and the judgment against it and demanded that Insurers indemnify it against any liability arising from the judgment, but Insurers denied coverage.

F. The Trial Court's Grant of Summary Judgment

In October 2004, Insurers moved for summary judgment or summary adjudication of issues based on the pollution exclusion and the watercourse exclusion. The court heard the motions in November 2004.
The court accepted Insurers' argument that the 1969 and 1978 releases were excluded from coverage because the event that triggered the coverage was the initial deposit of wastes into the site, which was neither sudden nor accidental. The later escape of pollutants from the site was not a covered event and therefore could not provide a basis for coverage even if it were "sudden and accidental." The court also found that the watercourse exclusion precluded coverage. Finally, the court found *349 that the State was required to allocate damage between covered and uncovered causes and had failed to do so.
In December 2004, the court granted summary judgment in favor of all four Insurers. The State erroneously appealed from the order granting summary judgment instead of the judgment itself, but we construe the notice of appeal to be from the judgment. (H.N. & Frances C. Berger Foundation v. City of Escondido (2005) 127 Cal.App.4th 1, 6-7, fn. 5, 25 Cal. Rptr.3d 19.)

II

DISCUSSION

A.-C.[**]

D. Application of the Pollution Exclusion to This Case

1. Interpretation of the policy terms[**]

2. Relevant discharge

Insurers point out that the court in Standun, Inc. v. Fireman's Fund Ins. Co., supra, 62 Cal.App.4th 882, 73 Cal.Rptr.2d 116 held: `Where hazardous waste material is deposited directly into a landfill, the relevant discharge of pollutants for purposes of the pollution exclusion is the initial release of the hazardous waste into the landfill, not the subsequent release of pollutants from the landfill into the water, air and adjoining land. [Citation.]" (Id. at p. 891, 73 Cal.Rptr.2d 116.) However, while Standun's holding may have been proper under the circumstances of that case, those circumstances are not present here.
In Standun, toxic substances migrated from a landfill into adjoining properties, in part because of the landfill operator's poor waste management practices. The insured had nothing to do with operating the landfill. Instead, the insured was sued under a strict kability theory simply because wastes generated at its place of business were transported to the landfill and deposited there. (Standun, Inc. v. Fireman's Fund Ins. Co., supra, 62 Cal.App.4th at p. 890, 73 Cal.Rptr.2d 116.)
Therefore, the Standun court concluded: "The relevant discharge as to Standun is the discharge of its wastes into the landfill. That discharge was purposeful and regular. Accordingly, the relevant discharge of pollutants was neither sudden nor accidental and coverage under the policy is barred by the pollution exclusion." (Standun, Inc. v. Fireman's Fund Ins. Co., supra, 62 Cal.App.4th at p. 892, 73 Cal.Rptr.2d 116, italics added.)
Here, in contrast, the State was not held liable for dumping wastes into the site. It was held liable for negligently selecting, designing, building, and operating the site. Its liability was based not on the release of wastes into the sitethat was, after all, the intended purpose of the sitebut on the release of wastes from the site when, because of the State's negligence, the site failed to contain them properly. Because the bases for the underlying liability in Standun and this case were different, Standun does not support denying coverage here.
Insurers argue that application of the pollution exclusion is not controlled by the basis of the insured's liability, but rather by whether coverage is sought for property damage arising from a discharge to land. If so, the pollution exclusion bars coverage unless the discharge is sudden and accidental. According to Insurers, here there is no dispute that the property damage arose out of discharges to land that were not sudden and accidental.
*350 Insurers' argument begs the question by assuming that if wastes intentionally deposited into a disposal site later escape the site and cause injury to adjacent property, the damage "arose out of only the initial deposit and not the later event that actually caused the wastes to escape. Nothing in the pollution exclusion or elsewhere in the policy compels that interpretation. The exclusion says the policy does not apply to "Property Damage arising out of the discharge, dispersal, release or escape" of pollutants "into or upon land or the atmosphere," but the exclusion "does not apply if such discharge, dispersal[,] release or escape is sudden and accidental." The phrase "arising out of is not defined.
"`California courts have consistently given a broad interpretation to the terms "arising out of or "arising from" in various kinds of insurance provisions.'" (Medill v. Westport Ins. Corp. (2006) 143 Cal. App.4th 819, 830, 49 Cal.Rptr.3d 570.) This language "`broadly links a factual situation with the event creating liability,'" and "`"requires [the court] to examine the conduct underlying the ... lawsuit, instead of the legal theories attached to the conduct."' [Citation.]" (Ibid.) Here, the "`event creating liability"' and the "`"conduct underlying the ... lawsuit"'" was the escape of the wastes from the site, not the deposit of the wastes into the site. It is not, as Insurers claim, undisputed that the escape of the wastes from the site was not sudden and accidental.
Furthermore, even if the phrase "arising out of reasonably could be construed to refer either to the initial deposit or the later escape, as an exclusionary provision, the pollution exclusion would have to be interpreted against Insurers. (TBB Investments, Inc. v. Fireman's Fund Ins. Co. (2006) 40 Cal.4th 19, 27, 50 Cal.Rptr.3d 597, 145 P.3d 472.) Therefore, even if the property damage "arose out of both sudden and accidental discharges and discharges that were not sudden and accidental, the policy would have to be construed to afford coverage for the damage.
The court in Travelers Casualty & Surety Co. v. Superior Court, supra, 63 Cal. App.4th 1440, 75 Cal.Rptr.2d 54 refined the principle stated in Standun in a way that is instructive here. While acknowledging, and accepting, Standun's holding that ordinarily "the relevant discharge is the initial disposal of toxic waste into the landfill" (Travelers, at pp. 1458-1459, 75 Cal.Rptr.2d 54), the court nonetheless stated: "This is not to say that environmental contamination damages connected with industrial dumping are automatically barred from coverage under the sudden and accidental exception to the pollution exclusion. An intervening event may occur between the initial `disposal of waste on the landfill and the actual damage that eventually resulted,' and that intervening event may have been sudden and accidental." (Id. at pp. 1459-1460, 75 Cal.Rptr.2d 54.) Therefore, under Travelers, even though the initial depositing of wastes into the Stringfellow Site was not "sudden and accidental," the State is still entitled to coverage if the 1969 discharge and/or the 1978 discharges were "sudden and accidental."
For these reasons, we conclude that the relevant discharge as to the State was the release of the wastes from the site after they had been deposited there by other entities. The later release is the relevant discharge for purposes of determining whether the State's discharge of pollutants was "sudden and accidental."

*351 3.-4.[***]

E. Watercourse Exclusion

Insurers contend the 1969 discharge was excluded from coverage by the "absolute" watercourse exclusion.[11] As they point out, an expert retained by the State noted in a 2004 report that when the site overflowed in 1969, waste was discharged into Pyrite Creek, a watercourse. Although the State acknowledges that the discharges went into Pyrite Creek, a watercourse, it argues that Insurers did not show the discharges did not also enter the land, and therefore the court should not have granted summary judgment based on the watercourse exclusion.
Insurers counter that at least the 1969 discharge was initially confined to Pyrite Creek, and the initial discharge was the relevant event for purposes of determining whether the watercourse exclusion applied. As evidence that the discharge first went into Pyrite Creek and only later contaminated the land, Insurers point to exhibits they submitted in support of their summary judgment motions. However, those exhibits fail to demonstrate that the 1969 overflow discharged waste only into the creek, even initially.
Insurers cite an October 1972 letter from the California Regional Water Quality Control Board to the County of Riverside that stated: "In the spring of 1969, the heavy rains exceeded the capacity of the storm water diversion ditches and runoff flowed through the dump site carrying some of the waste out of the dump and down a natural drainage ditch parallel to Pyrite Street crossing Highway 60 and Mission Boulevard." (Italics added.) Insurers also cite an October 1980 report prepared by the State Water Resources Control Board that stated: "The [1969] storm caused the hazardous wastes ponded behind a subsurface concrete dam to overflow into the Pyrite Creek drainage channel." (Italics added.)
Contour maps included in the record show that the Stringfellow Site was situated at the head of a canyon that sloped southwest toward Glen Avon. A drainage channel designated "Pyrite Channel" extended from the mouth of the canyon southwest across Highway 60, through Glen Avon, and beyond. Naturally, any liquid waste discharged from the site eventually would enter the channel if there was enough of it.
However, neither the maps nor any other evidence of which we are aware showed whether the creek filled the entire channel, or whether it began immediately at the boundary of the site or somewhere farther down the channel. Accordingly, the statements that pollutants went into the "drainage ditch" or "drainage channel" did not necessarily show that the discharges were confined to the creek that flowed through the channel. In fact, there was deposition testimony (presented by Insurers) that waste water from the 1969 discharge contaminated "[t]he soil within the canyon from the site down to the community." (Italics added.) Thus, there was at least a factual issue whether the discharge entered only the creek, or also entered the soil.
Insurers argue that a "watercourse" includes not only a creek but also the entire channel through which it flows and the ground where water usually flows, even when there is no water. They cite decisions involving riparian rights. Assuming, without deciding, that those decisions *352 are relevant in applying the watercourse exclusion, we note the California Supreme Court has defined "watercourse" for purposes of riparian rights as follows: "... `A watercourse is defined as a natural stream of water usually flowing in a definite channel, having a bed and sides, or banks, and discharging itself into some other stream or body of water.'" (Chowchilla Farms Inc. v. Martin (1933) 219 Cal. 1,16, 25 P.2d 435.)
The record in this case did not show that water usually flowed in the entirety of Pyrite Channel, over all of the land into which the 1969 discharge deposited contaminants, or that the channel discharged into some other stream or body of water. Hence, there was at least a factual issue whether the 1969 discharge was confined to a watercourse.[12]
In addition, there was evidence that pollution from the 1969 discharge entered groundwater at sites away from the creek. The October 1980 report stated: "Groundwater contamination downgradient of the site was first observed after the spring 1969 storm in the Stringfellow well 1Q1." According to the maps, well 1Q1 was located to the east of the creek channel rather than directly in its drainage path. Thus, the presence of groundwater contamination at the well site at least supported an inference that waste water could have been discharged onto the land adjacent to the creek, rather than only into the creek itself.
Insurers also cite a report prepared by the State's chief hydrogeologist, evidently in 1979, which stated: "Subsequent to a major storm system, the Riverside County Flood Control District reported to the Regional Board on March 17, 1969, that stormwater runoff carried waste out of the disposal site down Pyrite Creek and across Highway 60." However, the next page of the report stated that a technical report in January 1973 had "indicated that the degradation of the groundwater at the monitoring well was the result of surface runoff from the disposal site caused by storms during the spring of 1969." (Italics added.) The only monitoring well mentioned was well 1Q1. Thus, like the 1980 report, the 1973 report supported an inference that discharge of waste water onto the surface of the adjacent land, as opposed to discharge directly into the creek, could have polluted the groundwater.
In our view, discharge of pollutants into groundwater does not fall within the watercourse exclusion. There appear to be no California decisions on point, and apparently out-of-state courts are in conflict on the issue. (See Aetna Cos. & Sur. Co. v. Dow Chemical Co. (E.D.Mich.1998) 28 F.Supp.2d 440, 447.) However, we find persuasive the view stated in Dow that "body of water" means "an aggregate of water having defined boundaries..." (Ibid.; see also Lumbermens Mut. Cos. Co. v. Plantation Pipeline Co. (1994) 214 Ga.App. 23, 447 S.E.2d 89, 91-94.) Construing the phrase that way, groundwater contamination would not fall within the exclusion, as groundwater has no "defined boundaries." Therefore, if the 1969 discharge *353 polluted the groundwater by entering the land, the watercourse exclusion would not apply. Again, it appears there is a least a triable issue whether this happened.
For all of the above reasons, we conclude the court should not have granted summary judgment based on the watercourse exclusion.

F. Allocation Between Covered and Uncovered Losses

The State, in response to a request for admission, stated: "The State admits it cannot differentiate the work performed to date to remedy the property damage caused by the escape of contaminants [from one alleged release, e.g., through the fractured granite] from the work performed to date to remedy the property damage caused by, [sic] the escape of contaminants [from another alleged release, e.g., the `1969 overflow' or `1978 overflow']:..." (Original brackets; internal capitalization omitted.) The State similarly admitted it could not differentiate the expenses it had paid to remedy damage caused by one release from expenses paid to remedy damage from another release. Based on these admissions, Insurers argue that Golden Eagle Refinery Co. v. Associated Internat. Ins. Co. (2001) 85 Cal.App.4th 1300, 102 Cal.Rptr.2d 834 (Golden Eagle) and Lockheed Corp. v. Continental Ins. Co. (2005) 134 Cal. App.4th 187, 35 Cal.Rptr.3d 799 (LocA;heed) bar the State from recovering at all, whether or not the 1969 discharge was "sudden and accidental."

1. Golden Eagle and Lockheed

In Golden Eagle, the insured, Golden Eagle Refinery Co. (Golden Eagle), operated an oil refinery for 26 years and during that time routinely discharged crude oil and crude oil products on and into the ground, contaminating the soil. Some of the discharges were sudden and accidental, and others were not. (Golden Eagle, supra, 85 Cal.App.4th at p. 1304, 102 Cal. Rptr.2d 834.) Golden Eagle admitted it was unable to attribute any particular part of the property damage to any particular discharge. (Id. at p. 1310, 102 Cal.Rptr.2d 834.)
After operations ceased, the State required Golden Eagle to clean up the site. Golden Eagle then sought coverage from its liability insurers for the cleanup costs. The court stated that because some discharges were "sudden and accidental" and therefore covered by the policies, but other discharges were not, "[i]t would be the insured's burden at trial to prove that all of the damages it seeks to recover were caused by a covered event of discharge, failing which, Golden Eagle will recover nothing." (Golden Eagle, supra, 85 Cal. App.4th at pp. 1309-1310, 102 Cal.Rptr.2d 834, italics added.) Since Golden Eagle admitted it could not meet that burden, summary adjudication of the coverage claim was properly granted against it. (Id. at p. 1317, 102 Cal.Rptr.2d 834.)
In Lockheed, the insured, Lockheed Corp. (Lockheed), operated an aerospace research and manufacturing facility from about 1928 to the early 1990's, causing soil and groundwater contamination at the site. The federal government required Lockheed to clean up the contamination, and Lockheed sought coverage from its liability insurers for the cleanup costs. Lockheed submitted evidence of 14 accidents at the site between 1967 and 1980 in which a pollutant, PCE, was discharged. These discharges were covered by the policies. However, most of the pollution-causing events were routine leaks and spills that were not covered by the policies. (Lockheed, supra, 134 Cal.App.4th at pp. 212-215, 35 Cal.Rptr.3d 799.) Lockheed admitted *354 it could not separate the cleanup costs according to the individual pollutants involved and failed to show that the "handful" of accidental discharges "resulted in increased migration or penetration of the PCE contamination." (Id. at pp. 217-218, 35 Cal.Rptr.3d 799.)
Relying on Golden Eagle, the court held that to prove the causation and damages elements of its case Lockheed had "to, prove that these accidents affected the investigation and cleanup costs for which Lockheed was liable." (Lockheed, supra, 134 Cal.App.4th at p. 217, 35 Cal.Rptr.3d 799.) That would require "`the identification, allocation, and quantification of the contamination in relation to its source.' [Citation.]" (Id. at p. 218, 35 Cal.Rptr.3d 799.) Since Lockheed admitted it could not do that, the trial court properly excluded Lockheed's evidence. (Id. at pp. 218-219, 35 Cal.Rptr.3d 799, citing Golden Eagle, supra, 85 Cal.App.4th at p. 1316, 102 Cal.Rptr.2d 834.)

2. Partridge

The State argues Golden Eagle and Lockheed are contrary to the decision of the California Supreme Court in State Farm Mut. Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (Partridge). In Partridge, the insured negligently filed the trigger mechanism of his pistol to lighten the trigger pull. Later, he used the gun to shoot jackrabbits out of the windows of his truck as he drove through the countryside with two friends. The truck hit a bump and the gun fired, wounding one of the passengers. The question was whether the insured's liability for the damage was covered by the general liability provision of his homeowner's policy, which excluded liability arising from the use of a vehicle. (Id. at pp. 97-99,109 Cal.Rptr. 811, 514 P.2d 123.) That policy provided: "... `This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obliga
ted to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence.'" An "occurrence" was "`an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.' " (Id. at p. 99, fn. 5, 109 Cal.Rptr. 811, 514 P.2d 123.)
The court held that although the damage arose in part out of an excluded activity, the use of the truck, the homeowner's policy covered the damage: "Here the 'use' of Partridge's car was not the sole cause of Vanida's injuries but was only one of two joint causes of the accident.... Defendants correctly contend that when two such risks constitute concurrent proximate causes of an accident, the insurer is liable so long as one of the causes is covered by the policy." (Partridge, supra, 10 Cal.3d at p. 102, 109 Cal.Rptr, 811, 514 P.2d 123.)
The court further explained: "In the instant case, ... although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries. Under these facts the damages to Vanida are, under the language of the homeowner's coverage clause, `sums which the Insured ... (became) legally obligated to pay" because of the negligent filing of the trigger mechanism...." (Partridge, supra, 10 Cal.3d at p. 103, 109 Cal.Rptr. 811, 514 P.2d 123.)
Thus, the Partridge court interpreted the phrase "all sums which the Insured shall become legally obligated to pay as damages" to mean all amounts for which the insured would be held liable in a tort action. As the court further explained: "If, after negligently modifying the gun, Partridge had lent it to a friend who had *355 then driven his own insured car negligently, resulting in the firing of the gun and injuring of a passenger, both Partridge and his friend under traditional joint tortfeasor principles would be liable for the injury. In such circumstances, Partridge's personal liability would surely be covered by his homeowner's policy...." (Partridge, supra, 10 Cal.3d at p. 103, 109 Cal.Rptr. 811, 514 P.2d 123.) The result should be no different, the court said, "simply because, in the instant case, both negligent acts happened to have been committed by a single tortfeasor." (Ibid.)[13]

3. Garvey

Since Partridge, the California Supreme Court has not addressed the issue of coverage in a third party liability case involving concurrent causes. However, in Garvey v. State Farm Fire & Casualty Co. (1989) 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704 (Garvey), the court in addressing coverage in a first party case involving multiple contributing causes made several observations concerning Partridge that are instructive in this case.[14]
In Garvey, the insureds' home was damaged as a result of earth movement (an excluded cause) and negligent construction (a covered cause). The trial court ruled the damage was covered by the insureds' homeowner's policy, based on the concurrent causation analysis in Partridge. (Garvey, supra, 48 Cal.3d at pp. 399-401, 257 Cal.Rptr. 292, 770 P.2d 704.) The Supreme Court reversed, holding that, the "efficient proximate cause" analysis of Sabella v. Wisler (1963) 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889, and not the "concurrent cause" analysis of Partridge, should control first party coverage cases. (Garvey, at pp. 412-413, 257 Cal.Rptr. 292, 770 P.2d 704.) Under the Sabella analysis, "`where there is a concurrence of different causes, the efficient causethe one that sets others in motionis the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster.' " (Sabella, at pp. 31-32, 27 Cal.Rptr. 689, 377 P.2d 889.)
In explaining why the Partridge analysis did not govern first party cases, the court first stated that in contrast to coverage in first party cases, "the right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty." (Garvey, supra, 48 Cal.3d at p. 407, 257 Cal.Rptr. 292, 770 P.2d 704, italics added.) Thus, in third party cases "the focus is, at least initially, on the insured's legal obligation to pay for injury or damage arising out of an `occurrence.' " (Id. at p. 408, 257 Cal.Rptr. 292, 770 P.2d 704, italics added.)
Further, the court said, application of tort law analysis in third party cases *356 means that in such cases "the insurer agrees to cover the insured for a broader spectrum of risks" than in first party cases. (Garvey, supra, 48 Cal.3d at p. 407, 257 Cal.Rptr. 292, 770 P.2d 704.) In fact, since in most first party cases "the insured can point to some arguably covered contributing factor," the court observed that "if the rule in Partridge [citation] were extended to first party cases, the presence of such a cause, no matter how minor, would give rise to coverage." (Id. at p. 408,109 Cal.Rptr. 811, 514 P.2d 123.)
The Garvey court also held the Court of Appeal in that case had misinterpreted Partridge in determining "that in order for coverage to be found under Partridge, the concurrent event alone must have been a 'sufficient condition' of the lossi.e., capable of producing damage itself." (Garvey, supra, 48 Cal.3d at p. 409, 257 Cal.Rptr. 292, 770 P.2d 704, fn. omitted.) The court explained that "[t]he term `sufficient condition' as used by the Court of Appeal missapplied [sic ] the Partridge holding because it implied that negligent driving alone could have caused plaintiffs injury in that case." (Id. at p. 409, fn. 8, 257 Cal. Rptr. 292, 770 P.2d 704.)
As Garvey was a first party case, the Garvey court expressed no opinion on the proper analysis to be applied in third party cases involving multiple causes. Instead, it simply clarified that Partridge "should be limited to the third party tort liability context." (Garvey, supra,' 48 Cal.3d at p. 410, fn. 9, 257 Cal.Rptr. 292, 770 P.2d 704.) The court did say, "[W]e leave the application of Partridge in the liability context to a future liability case that raises the concurrent causation issue," suggesting that it might revisit the issue if a suitable opportunity presented itself. (Id. at p. 409, fn. 8, 257 Cal.Rptr. 292, 770 P.2d 704.)
Justice Kaufman concurred in the result in Garvey but not in the court's reasoning. He believed Sabella, not Partridge, should govern not only first party cases but also third party cases. In Justice Kaufman's view, under the Sabella analysis there would be no coverage in Partridge because the filing of the triggerthe covered cause"was activated by the other cause," the driving of the truck. "Thus, under Sabella principles it was the negligent driving of the vehicle over the rough terrain with the gun pointed at the passenger that was the `efficient' or `predominant' cause of the injury and coverage for such accidental injury arising out of the use of a vehicle was expressly excluded by the homeowner's policy." (Garvey, supra, 48 Cal.3d at p. 415, 257 Cal.Rptr. 292, 770 P.2d 704 (cone. opn. of Kaufman, J.).)
As this case involves third party liability, Garvey has no direct application here. Garvey does, however, make clear that under Partridge:
(1) "the right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty." (Garvey, supra, 48 Cal.3d at p. 407, 257 Cal.Rptr. 292, 770 P.2d 704);
(2) in a third party liability policy "the insurer agrees to cover the insured for a broader spectrum of risks" than in first party cases. (Garvey, supra, 48 Cal.3d at p. 407, 257 Cal.Rptr. 292, 770 P.2d 704);
(3) in a third party case, the presence of a covered cause, "no matter how minor, would give rise to coverage" (Garvey, supra, 48 Cal.3d at p. 408, 257 Cal.Rptr. 292, 770 P.2d 704); and
(4) the insured in a third party case need not show that the covered cause was "a `sufficient condition' of the, lossi.e., capable of producing damage itself." (Garvey, supra, 48 Cal.3d at p. 409, 257 Cal.Rptr. 292, 770 P.2d 704, fn. omitted.)

*357 4. Incompatibility of Golden Eagle and Lockheed with Partridge and Garvey

It is readily apparent from the foregoing discussion that Golden Eagle and Lockheed are incompatible with the views expressed in Partridge and Garvey. Golden Eagle held that "insurers are not required to indemnify for any damages not caused by a covered event." (Golden Eagle, 85 Cal.App.4th at p. 1314, 102 Cal.Rptr.2d 834.) By this the court meant that the insured must negate the possibility that any part of the damages for which it seeks indemnity was caused by an uncovered event. Partridge, on the other hand, held that "coverage under a liability insurance policy is equally available to an insured whenever an insured risk constitutes simply a concurrent proximate cause of the injuries." (Partridge, supra, 10 Cal.3d at pp. 104-105, 109 Cal.Rptr. 811, 514 P.2d 123, fn. omitted.) Thus, under Partridge the insured is entitled to coverage even if the damages were partially caused by an uncovered risk.
In a similar vein, the Golden Eagle court stated that the insured's damages were not covered because it admitted "that its damages were `indivisible.'" (Golden Eagle, supra, 85 Cal.App.4th at p. 1315, 102 Cal. Rptr.2d 834.) Yet that was precisely the situation in Partridge as well. The damage caused by modifying the trigger was not divisible from that caused by the use of the vehicle. One injury, from one bullet, resulted from both causes. The court nonetheless held the damage was covered.
The holding of the Golden Eagle and Lockheed courts that an insured must prove the damages for which it seeks coverage were caused solely by a covered cause and not by a combination of covered and uncovered causes also is contrary to the Supreme Court's interpretation of Partridge in Garvey. The Garvey court stated that the Court of Appeal in that case had misinterpreted Partridge by concluding "that in order for coverage to be found under Partridge, the concurrent event alone must have been a `sufficient condition' of the lossi.e., capable of producing damage itself." (Garvey, supra, 48 Cal.3d at p. 409, 257 Cal.Rptr. 292, 770 P.2d 704, fn. omitted.) If the insured need not show that the concurrent cause was capable of producing damage by itself, then it follows that, contrary to Golden Eagle and Lockheed, the insured cannot be required to trace the damages for which it seeks coverage to one cause and one cause only.
Finally, as was made clear in both Partridge and Garvey, the Partridge court adopted a tort liability analysis in determining coverage in third party cases. Because the insured's negligent modification of the gun was sufficient by itself "to render him fully liable for the resulting injuries," the damages to the passenger were "`sums which the Insured ... [became] legally obligated to pay' because of the negligent filing of the trigger mechanism ...." (Partridge, supra, 10 Cal.3d at p. 103, 109 Cal.Rptr. 811, 514 P.2d 123.) The criterion for coverage is not, therefore, whether the insured can differentiate between the amount of the damages that are allocable to the covered and uncovered causes, but whether the insured would be held liable in tort for the damages. Where, as in Partridge, the damages are indivisible, the insured is liable for all the damages and hence is covered for the entire amount.
Golden Eagle and Lockheed, however, expressly rejected any reliance on tort liability principles. Both Golden Eagle and Lockheed stated: "A claim for indemnity is a contract claim...." (Golden Eagle, supra, 85 Cal.App.4th at p. 1316, 102 Cal. Rptr.2d 834; see Lockheed, supra, 134 Cal. App.4th at p. 217, 35 Cal.Rptr.3d 799 *358 [quoting Golden Eagle].) The Golden Eagle court added: "Golden Eagle's argument that it need only prove that a sudden and accidental event caused an appreciable amount of the contamination is wrong because it is essentially a tort approach. ... `Substantial cause' may be sufficient to make a prima facie case in a tort action in order to support & joint and several judgment, but in the context of a coverage dispute relating only to the duty to indemnify, the tort threshold is not sufficient." (Golden Eagle, at p. 1316, 102 Cal.Rptr.2d 834, italics added.) As the Partridge court's joint tortfeasor example illustrated, however, in that court's view the damage was covered precisely because the evidence would support a joint and several judgment against the insured.
The incompatibility of Golden Eagle's causation analysis with Partridge is best illustrated by the fact that Golden Eagle used exactly the analysis Justice Kaufman used in Garvey in disagreeing with Partridge. Justice Kaufman stated: "The first flaw in Partridge is, as the majority suggests, that it imported into the determination of coverage, concepts and rules of tort law inapplicable to the contractual question of the coverage afforded by an insurance policy, and, based on them, adopted the tort rule of concurrent causation to determine coverage." (Garvey, supra, 48 Cal.3d at pp. 413-414, 257 Cal. Rptr. 292, 770 P.2d 704 (cone. opn. of Kaufman, J.), italics added.) Justice Kaufman, however, like the Golden Eagle court, thought that coverage "is to be determined by contract principles, not tort principles, in both first party and third party cases." (Garvey, at p. 414, 257 Cal.Rptr. 292, 770 P.2d 704.)
Golden Eagle did not, of course, acknowledge that it was adopting a position that the Supreme Court had rejected in Partridge and had implicitly rejected again in Garvey when it declined to adopt Justice Kaufman's analysis and left intact the application of Partridge to third party cases. In fact, neither Golden Eagle nor Lockheed acknowledged Partridge at all. The failure of the Courts of Appeal in Golden Eagle and Lockheed even to mention a potentially conflicting Supreme Court decision is puzzling enough. In the case of Golden Eagle, it is even more puzzling, because the insured in Golden Eagle cited Partridge in its petition for rehearing, arguing: "[T]he Court appears to hold that where third party property damage results from both covered and non-covered causes, a policyholder losses [sic] coverage unless it segregates and quantifies the damage resulting from covered causes versus non-covered causes. [Citation.] This apparent ruling conflicts with California Supreme Court authority on the `concurrent causation' doctrine that provides that a policyholder is entitled to full liability coverage for losses caused `concurrently' by independent covered and non-covered events. State Farm Mutual Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 104-105, 109 Cal.Rptr. 811, 514 P.2d 123."
Thus, the potential conflict between Partridge and Golden Eagle was squarely before the Golden Eagle court. The court's failure, nonetheless, to address Partridge at least calls into question Golden Eagle's rehability as precedent.
We are not the first to make that observation. The authors of a treatise on California insurance litigation have noted that Golden Eagle "may not be reliable precedent" because "the court seems to have overlooked the causation standards set forth by the California Supreme Court in Partridge, above." (2 Croskey et al., Cal. Practice Guide: Insurance Litigation (The *359 Rutter Group 2005) § 7:244:8, pp. 7A-78-79.)[15]
Moreover, even apart from its inconsistency with Partridge, Golden Eagle's analysis is not convincing. In support of its conclusion, the court cited Civil Code section 3300, which provides: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Golden Eagle read the statute to mean that unless the insured can show what proportion of its total liability was the direct result of a covered cause, its damages for breach of the duty to indemnify are zero. (See Golden Eagle, supra, 85 Cal.App.4th at p. 1316, 102 Cal. Rptr.2d 834.)
However, a liability insurance policy is a contract not for a good or a personal service, but for indemnification against legal liability in tort. (Stein-Brief Group, Inc. v. Home Indemnity Co. (1998) 65 Cal. App.4th 364, 369-370, 76 Cal.Rptr.2d 3.) Thus, although an action for failure to indemnify is an action for breach of contract, the insurer's liability for breach of the policy is measured by the tort liability incurred by the insured that the insurer failed to cover. It follows that the "detriment proximately caused" by the breach of the duty to indemnify is the amount the insured is liable in tort to pay because of a covered risk. Under the principle of joint and several liability, that amount includes all of the damages of which the covered risk is a proximate cause, even if it is not the only cause.
Thus, to say as the Golden Eagle court did that a coverage action is an action for breach of contract and therefore the insured is limited to contract damages ignores the fact that the measure of the insured's liability, and hence the measure of its damages, is governed by tort and not by contract law. For this same reason, we must reject Insurers' contention that the State's position conflates the concurrent cause doctrine and the requirement that in a breach of contract case the insured must prove what damages flowed from a covered event. In the liability insurance context, the two are the same because liability resulting even in part from a concurrent cause is wholly, not partially, covered.
Golden Eagle also relied on FMC Corp. v. Plaisted & Companies (1998) 61 Cal. App.4th 1132, 72 Cal.Rptr.2d 467 (FMC Corp.). According to the Golden Eagle court, FMC Corp. "stands for the proposition that where both covered and not covered events cause damages a failure to differentiate and allocate is fatal to a claim for indemnity." (Golden Eagle, supra, 85 Cal.App.4th at p. 1314, 102 Cal.Rptr.2d 834.) In fact, FMC Corp. held exactly the oppositethe insured wanted to allocate, and the court held it could not do so.
FMC Corp. involved pollution at multiple sites operated by the insured. (FMC Corp., supra, 61 Cal.App.4th at pp. 1143-1144, 72 Cal.Rptr.2d 467.) Pollution was only covered if it unexpectedly and unintentionally caused damage. (Id, at p. 1149, 72 Cal.Rptr.2d 467.) At certain sites, there were several pollution sources, some unexpected and some not. The insured wanted to argue at trial that the unexpected sources could be treated as separate "occurrences" that would be covered even though the expected sources were not covered. *360 (Id. at p. 1161, 72 Cal.Rptr.2d 467.) However, the insurance policies covering the sites provided: "All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." (Id. at p. 1149, 72 Cal.Rptr.2d 467.)
At the beginning of its discussion, the FMC Corp. court described the insured's proposed argument: "A site might (for example) have had two sources of pollutants, each of which had contributed to groundwater contamination, and while FMC could hope to prove that it had not expected one of the sources to cause the damage it could not reasonably expect to prove that the damage caused by the other source was unexpected. If the totality of damage attributable to the two sources were considered a single occurrence, then FMC's inability to establish the "unexpectedly" element as to one of the sources would jeopardize its prospects for coverage as to either source." (FMC Corp., supra, 61 Cal.App.4th at p. 1161, 72 Cal.Rptr.2d 467.)
The Golden Eagle court quoted this statement (Golden Eagle, supra, 85 Cal. App.4th at p. 1311, 102 Cal.Rptr.2d 834), and Insurers rely on it as additional support for their allocation argument. However, both Golden Eagle and Insurers overlook the statement's context and the FMC Corp. courts subsequent discussion. The court only reached the merits of the insured's proposed argument with respect to one site. At that site, there were four groundwater pollution sources, only three of which were unexpected. The insured argued there were multiple "occurrences," because the different pollution sources were separate "premises locations" within the site as a whole. (FMC Corp., supra, 61 Cal.App.4th at pp. 1166, 1169, 72 Cal. Rptr.2d 467.)
The court disagreed, holding that "premises location" meant the entire site and not a particular location within the site. (FMC Corp., supra, 61 Cal.App.4th at p. 1169, 72 Cal.Rptr.2d 467.) Thus, FMC Corp.'s holding turned on the issue of the proper interpretation of the "one occurrence" and "one premises location" clauses in a multiple-source pollution case. Golden Eagle not only did not discuss that issue, the Golden Eagle court did not even indicate whether the policies in that case contained "one occurrence" or "one premises location" clauses. Instead, Golden Eagle relied on a wholly different analysis, founded on general principles of contract law and proof of damages.
"Accordingly, despite the Golden Eagle court's claim that FMC Corp. was "squarely on point" (Golden Eagle, supra, 85 Cal. App.4th at p. 1314, 102 Cal.Rptr.2d 834), FMC Corp. does not support Golden Eagle's "allocation" analysis. In fact, FMC Corp. actually is inconsistent with Golden Eagle's allocation analysis, since FMC Corp. did not allow allocation of pollution at one site among various sources of pollution at that site.
The policies in this case contained "one occurrence" clauses, but Insurers do not rely on those clauses, and the parties have not briefed or argued the effect of the clauses. Therefore, it is not appropriate for this court to address the matter, and FMC Corp. is no more relevant here than it was in Golden Eagle. At any rate, FMC Corp., like Golden Eagle and Lockheed, failed to consider Partridge's concurrent cause analysis and is unreliable for that reason as well.
For the foregoing reasons, we do not consider Golden Eagle to be persuasive precedent for applying the "allocation" analysis to deny recovery in this case. Since Lockheed relied uncritically on Golden Eagle to reach the same holding, that *361 case is no more persuasive. Even if the two cases were persuasive in themselves, as stated they are incompatible with Partridge and Garvey which, as Supreme Court precedent, must control.

5. Application of Partridge to this case

The property damage coverage clauses of the policies in this case obligated Insurers "[t]o pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of liability imposed by law, including Chapter 1681 of the State of California Statutes of 1963, or liability assumed by contract, insofar as the State may legally do so, for damages, including consequential damages, because of direct damage to or destruction of tangible property (other than property owned by the Insured), including the loss of use thereof, which results in an Occurrence during the policy period."
The policies defined an "Occurrence" as "an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in ... Property Damage neither expected nor intended from the standpoint of the Insured."
The insuring language in Partridge was substantially the same, providing: "... `This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence.'" (Partridge, supra, 10 Cal.3d at p. 99, fn. 5, 109 Cal.Rptr. 811, 514 P.2d 123.) "Occurrence" was defined as "`an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.'" (Ibid.)
Based on that language, Partridge found coverage because "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries." (Partridge, supra, 10 Cal.3d at p. 103, 109 Cal.Rptr. 811, 514 P.2d 123.) Therefore, the resulting damages were "under the language of the homeowner's coverage clause, `sums which the Insured ... [became] legally obligated to pay' because of the negligent filing of the trigger mechanism...." (Ibid.) The insured's liability for modifying the gun existed "independently of any `use' of his car," and therefore was covered. (Ibid.)
Applying that same reasoning to the substantially similar policy language in this case would support the conclusion that the damages from the escape of contamination from the site likewise were covered. There is evidence from which a reasonable trier of fact could conclude the 1969 discharge was "neither expected nor intended ..." If it were proven that the 1969 discharge was a concurrent cause of indivisible damages for which the State was held liable, then under tort law principles the State's liability for that discharge would suffice, in itself, to render the State liable for all of the damages. In that event, all of the damages would be "sums which the Insured shall become obligated to pay by reason of liability imposed by law" under the insuring clauses of the policies.
To borrow Partridge's joint tortfeasor analogy, suppose that in this case the State's negligence caused the 1969 discharge, but another party's negligence caused the other discharges from the site and that all of the discharges contributed to an indivisible injury. Under Partridge, because the State would be jointly and severally liable for all of the resulting damage and not just the amount directly traceable to its own negligence, if the 1969 discharge were covered Insurers would be liable to indemnify the State against all of *362 its joint and several liability. Partridge makes clear that the result is no different merely because all of the negligent conduct is committed by one tortfeasor instead of two.
Insurers argue that a court should not apply the concurrent cause analysis until the insured satisfies its initial burden to "prove what damages resulted from the particular occurrence for which it seeks coverage, not simply `all sums.'" Therefore, Insurers assert, the State must establish "how much of the damages it seeks coverage for was caused by the 1969 event."
However, Partridge holds that to determine whether an injury was "caused" by a particular event for purposes of deciding whether the injury is covered, a court must ask whether the event was "a" cause of the injury. It is not necessary that the event be the only cause. Therefore, the concurrent cause analysis affects the coverage question, not just the question of what damages the insured has suffered as a proximate result of the breach of the insurance policy.
Moreover, the policies in this case do not say that liability for damages is covered only if the damages solely "result from" or are solely "caused by" a particular event. Instead, they say that liability is covered if it is imposed "because of property damage that "results in" an Occurrence. That the liability also may have been imposed partially "because of property damage that does not result in an Occurrence does not preclude coverage. At least, that is one reasonable interpretation of the policy language. If there is a reasonable interpretation of an insurance policy that supports coverage, this court is, of course, required to adopt that interpretation. (TRB Investments, Inc. v. Fireman's Fund Ins. Co., supra, 40 Cal.4th at p. 27, 50 Cal.Rptr.3d 597, 145 P.3d 472.)
Insurers in the joint tortfeasor situation would, of course, have a right of subrogation against the other tortfeasor. In the insurance context, the doctrine of equitable subrogation "`permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid.' [Citation.]" (United Services Automobile Assn. v. Alaska Ins. Co. (2001) 94 Cal. App.4th 638, 645, 114 Cal.Rptr.2d 449:) Presumably, to exercise that right Insurers would have to show what proportion of the State's joint and several liability was caused by the other tortfeasor. Under Partridge, though, Insurers would still be liable to indemnify the State against its total joint and several liability and not just the part the State could prove was caused by its own negligence.
As Insurers point out, Partridge differs from this case that in Partridge the damage was instantaneous, while in this case the damage from the discharge of contamination accrued gradually. However, Partridge only required for coverage that the covered cause be a "concurrent" cause of the damage. There was evidence from which a reasonable trier of fact could conclude the 1969 discharge was a concurrent cause of the damage for which the State was held liable.[16]
*363 The State's expert report from 2004 concluded that by 1960 contaminants exited the subsurface of the site around the east and west ends of the concrete barrier dam and through the fractured bedrock underneath the dam. The report stated that each of these three "flow pathways" leading to contaminant exit from the site east, west, and under the damwas separate from the others and resulted from different causes.
However, the report also identified a "fourth path flow" that existed downstream of the site in the alluvium, weathered bedrock, and fractured bedrock. The report stated that once the contaminants exited the site through the three pathways already described, the contamination plume continued to migrate downgradient due to the continuous motion of the groundwater to the southwest. The plume contaminated both soils and groundwater farther downstream and extended several thousand feet downgradient of the site. Through at least the late 1980's, the plume was moving progressively farther from the site, and damage to the soils and groundwater downgradient of the site was still ongoing in 2004.
The report further stated that a program of soil sampling conducted downstream of the site after the 1978 discharges indicated waste contaminated soils downgradient of the site and that "it is reasonable to expect that much of the soil contamination detected was from the 1969 event." The report went on to state: "Because the soils in the canyon below the Site are permeable, it is probable that the 1969 flood contributed to downstream groundwater contamination in addition to soil contamination."
The author of the report, V. Stephen Reed, testified at a deposition that the soil contamination from the 1969 discharge was "part" of the contamination that was measured in the sampling program after the 1978 discharges, because "some" of the contaminated soil remained in "some places" during the time between the 1969 and 1978 discharges. Similarly, a report of January 1977 prepared by consulting engineers concluded that the abrupt appearance of higher contamination levels at a monitoring well in 1972 was most likely caused by continued leaching of contaminants deposited during the 1969 floods.
A reasonable trier of fact could conclude from the above evidence that contamination from the 1969 discharge entered and remained in the soil and groundwater at the same time that the subsurface leakage around and under the barrier dam and the 1978 discharges were occurring. Reed's conclusions that "some" of the contamination found in the sampling program after the 1978 discharges was caused by the 1969 discharge and that the 1969 discharge "contributed" to the downstream soil and groundwater contamination meant that the remainder of the contamination must have been caused by one of the other sources of contamination. Therefore, the 1969 discharge and the other discharges must have *364 combined to cause the entirety of the contamination, or so, at least, a reasonable trier of fact could infer.
For this reason, Insurers' claim that the injury in this case was not indivisible is unfounded. In fact, Insurers effectively premised their allocation argument on the assumption that the injury was indivisible, because the thrust of the argument is that the State is required to, but cannot, divide the injury among the multiple causes that produced it. Similarly, Insurers supported their argument with Golden Eagle, in which the court found no coverage because the insured admitted its damages were "`indivisible.'" (Golden Eagle, supra, 85 Cal.App.4th at p. 1315, 102 Cal. Rptr.2d 834.) If, as Insurers now argue, the injury was not indivisible, then their reliance on Golden Eagle was incorrect.[17]
Thus, if the 1969 discharge was covered, the situation in this case would be analogous to that in Partridge, with covered and uncovered causes acting concurrently to cause an injury that could not be allocated among them. In that event, a reasonable trier of fact could conclude that the amount for which the State was held liable represented the damage attributable to an indivisible injury resulting from several causes.[18]
The fact that not all of the damage occurred instantaneously as in Partridge should not affect the applicability of Partridge here. That point is illustrated by State Farm Fire & Cos. Co. v. Kohl (1982) 131 Cal.App.3d 1031, 182 Cal.Rptr. 720, another case not mentioned in either Golden Eagle or Lockheed. In Kohl, the insured hit a motorcyclist while driving his truck, injuring her. After the collision, he dragged her out of the street, which she alleged caused her additional serious injury. (Id. at p. 1034, 182 Cal.Rptr. 720.) Even though not all of the damage occurred instantaneously, or even concurrently in a strict temporal sense, the court held, citing Partridge, that liability for the damage was covered by the insured's homeowner's policy. Since one of the acts that caused the injury, dragging the victim from the street, did not arise from the use of the insured's vehicle, the vehicle exclusion did not apply. (Id. at p. 1039, 182 Cal.Rptr. 720.)
Coverage in this case also is supported by the definition of "occurrence" in the policies. As noted, "occurrence" was defined to mean not only a discrete event, but also "continuous or repeated exposure to conditions" if the exposure resulted in property damage. An occurrence therefore *365 need not happen instantaneously in order to be covered.[19]
Insurers contend, however, that Partridge should not apply because in Partridge there was no doubt that the same injury and the totality of that injury resulted from the concurrent causes, while here, the injury began before and continued after the covered event, and the State only claims the 1969 discharge caused part of the total injury. The argument is not persuasive for two reasons.
First, the Supreme Court has made clear that a concurrent tortfeasor is fully liable for an indivisible injury regardless whether that tortfeasor's conduct by itself would have caused the same injury or the totality of that injury. In American Motorcycle Assn., the court explained that in some cases, "it is simply impossible to determine whether or not a particular concurrent tortfeasor's negligence, acting alone, would have caused the same injury. Under such circumstances, a defendant has no equitable claim vis-à-vis an injured plaintiff to be relieved of liability for damage which he has proximately caused simply because some other tortfeasor's negligence may also have caused the same harm." (American Motorcycle Assn. v. Superior Court, supra, 20 Cal.3d at pp. 588-589, 146 Cal.Rptr. 182, 578 P.2d 899.) Since under Partridge coverage is measured by the extent of the insured's liability to theinjured party, the quoted language from American Motorcycle Assn. means that there is coverage for the entire injury even if it is not possible to prove the insured's covered act caused the same injury or the total injury.
Second, the record does not show that the injury for which the State seeks coverage was not caused or contributed to by the 1969 discharge. All that is clear is that the discharge of contamination began before 1969. There is no indication when the resulting injury to the downstream property occurred.
Under the policies' insuring clauses, coverage turns on the timing of the injury, not the act that causes the injury. An act is covered if it "results in an Occurrence during the policy period," which means that it "results, during the policy period, in ... Property Damage neither expected nor intended from the standpoint of the Insured." Thus, the injury, though not the act, must occur during the policy period for the act to be covered.
The policies in this case covered September 1976 to May 1978. Accordingly, any covered injury necessarily occurred after the 1969 discharge and therefore could have been contributed to by that discharge. The State's expert, in fact, concluded it was reasonable to expect that much of the contamination after the 1978 discharge was from the 1969 discharge.
Insurers finally contend that because they are excess insurers, they have no liability to the State unless the State proves that the damage caused by a covered event exceeded the underlying coverage. This argument is founded on the same premisethat an insurer's duty to indemnify only extends to liability that the insured can prove is traceable to a covered causethat we have already concluded Partridge requires us to reject. Therefore, we need not address the issue of excess insurance separately.
*366 For these reasons, we conclude Partridge's analysis should govern this case. Under that analysis, the State is not required to allocate its liability based on the cause of the underlying damage, as long as a covered cause is a concurrent contributing cause. Since there is at least evidence raising a reasonable inference that the 1969 discharge contributed to the damage for which the State was held liable, under Partridge a reasonable trier of fact could conclude the State's liability was covered.

III

DISPOSITION
The summary judgment in favor of Insurers is reversed. The matter is remanded with directions to grant Insurers' alternative motions for summary adjudication estabhshing that liability for the gradual escape of pollutants from the site over the years and the 1978 discharges was excluded by the pollution exclusion. The parties shall bear their own costs on appeal.
We concur: RAMIEEZ, P.J., and HOLLENHORST, J.
NOTES
[*] Pursuant to California Rules of Court, rules for publication with the exception of parts 8.1105(b) and 8.1110, this opinion is certified II.A-C, II.D.1, II.D.3, and II.D.4.
[1] This information, and other information in our statement of the facts, comes from the report of a special master appointed to make findings of fact in United States of America et al., v. J.B. Stringfellow, Jr., et al., United States District Court for the Central District of California, case No. CV 83-2501 JMI, reported at 1993 WL 565393. The special master was appointed by the court in that case to conduct a hearing to determine the State's liability for pollution caused by the escape of wastes from the Stringfellow Site. His report, dated November 30, 1993, is almost 500 pages including appendices and was submitted by Insurers in support of their summary judgment motions. The district court, in an unpublished decision in 1995, adopted the special master's findings, conclusions, and recommendation as modified. (United States v. Stringfellow (C.D.Cal.1995) 1995 WL 450856 at pp. 1, 6.) The facts we recite from the report appear not to be disputed for purposes of this appeal.
[2] We note the district court's unpublished 1995 decision states that the court found the State 65 percent liable on claims asserted under federal law and 100 percent liable on claims asserted under state law. (United States v. Stringfellow, supra, 1995 WL 450856 at p. 6.)
[3] We are concerned here only with the coverage for property damage (coverage "B" in the policy), because there is no claim that the State was held liable for any personal injury (coverage "A" in the policy).
[4] In 1985, the insurance industry modified the standard general liability policy to delete the "sudden and accidental" exception from the pollution exclusion. (MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 644, 3 Cal.Rptr.3d 228, 73 P.3d 1205.)
[5] Insurers claim the Columbia policy "follows form to the same language as do the other policies," and that "the policy stipulation simply did not physically attach the underlying language." This court, of course, is limited to the record on appeal. Insurers did not move to admit the missing language as evidence on appeal. (Cal. Rules of Court, former rule 22(c) (see now rule 8.252(c)).)
[**] See footnote *, ante.
[***] See footnote *, ante.
[11] As noted, ante, the exclusion was not absolute in the Columbia policy.
[12] Insurers also cite this court's decision in Ortega Rock Quany v. Golden Eagle Ins. Corp. (2006) 141 Cal.App.4th 969, 46 Cal.Rptr.3d 517. They provide no internal page citation, so it is unclear what part of the decision they claim is relevant here. In any event, Ortega Rock Quarry did not involve the watercourse exclusion or the definition of "watercourse." The case involved an "absolute" pollution exclusion, and the issues pertaining to the application of the exclusion were whether the language of the exclusion was ambiguous as to the definition of "pollutant" and whether dirt and rocks deposited into a creek were "pollutants." (Id. at pp. 979-980, 46 Cal.Rptr.3d 517.) We do not see how the decision has any relevance here.
[13] Partridge was decided before the Supreme Court, in Li v. Yellow Cab Co. (1975) 13 Cal.3d 804, 828-829, 119 Cal.Rptr. 858, 532 P.2d 1226, adopted the comparative negligence doctrine. However, "adoption of comparative negligence ... does not warrant the abolition or contraction of the established joint and several liability' doctrine; each tortfeasor whose negligence is a proximate cause of an indivisible injury remains individually liable for all compensable damages attributable to that injury." (American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578, 582, 146 Cal.Rptr. 182, 578 P.2d 899.) Joint and several liability does not, however, apply to liability for noneconomic damages in cases controlled by Proposition 51. (Civ. Code, § 1431.2, subd. (a).)
[14] "[T]he distinction between first and third party claims can be summarized as follows: If the insured is seeking coverage against loss or damage sustained by the insured, the claim is first party in nature. If the insured is seeking coverage against liability of the insured to another, the claim is third party in nature." (Garvey, supra, 48 Cal.3d at p. 399, fn. 2, 257 Cal.Rptr. 292, 770 P.2d 704.)
[15] It is interesting to note that Justice Kaufman was one of the original co-authors of the cited treatise. Evidently, though he did not agree with Partridge, he did agree that Golden Eagle was not consistent with Partridge.
[16] Insurers assert that in the unpublished part of this opinion this court described the 1969 rain event as an "intervening cause," and that an intervening cause cannot be a concurrent cause. What we actually said was that the 1969 discharge could qualify as a sudden and accidental "intervening event" as the term was used in Travelers Casualty & Surety Co. v. Superior Court, supra, 63 Cal. App.4th at p. 1460, 75 Cal.Rptr.2d 54, to mean an event after the initial discharge of waste into a site that causes appreciable damages over and above the routine dumping. (Ibid.) In contrast, an "intervening cause" is "a later cause of independent origin" that relieves the original tortfeasor of liability if the intervening cause and the resulting damage were not foreseeable. (Ballard v. Uribe (1986) 41 Cal.3d 564, 587, 224 Cal.Rptr. 664, 715 P.2d 624.) The 1969 discharge was not an "intervening cause" with respect to the subsurface discharges around and under the dam, because it was not wholly "later" (the discharges overlapped in time) and was not "of independent origin" (the State's negligence caused all of the discharges). Therefore, the earlier discharges and the 1969 discharge could be "concurrent causes" with respect to one another even though the 1969 discharge was an "intervening event" with respect to the original dumping.
[17] At trial, the State would have to prove its damages were indivisible to claim coverage under Partridge. Insurers would not be foreclosed from offering proof that in fact the damages were not indivisible. Our point is only that, for purposes of summary judgment, Insurers effectivery assumed in their allocation argument that the damages could not be divided.
[18] Insurers note that in answers to interrogatories the State said that the subsurface escape of contaminants to the east, west, and under the dam, and the 1969 and 1978 discharges, were five separate "occurrences." However, the State only said that the damage from the five sources of contamination "began" at different times and locations. The State also said that the damage from all five sources continued through the policy periods and that each of the five occurrences had "contributed to the plume of contaminants." Thus, the State did not foreclose the possibility that the five sources combined to produce an indivisible injury. Moreover, the answers were verified on July 15, 2004, two weeks before the date of the expert report, July 30, 2004, and presumably were made without the benefit of the report. At any rate, Insurers have not argued that the answers have preclusive effect here, and the effect, if any, of the answers should be determined on remand, as it depends on factual as well as legal determinations.
[19] As noted, ante, the insuring clause of the Columbia policy as it appears in our record does use the term "occurrence" to describe the event that triggers coverage. However, Columbia's insuring clause provides it will indemnify the State for "loss," with "loss" defined to mean "the sums paid as damages in settlement of a claim or satisfaction of a judgment for which the insured is legally liable ..." There is no requirement in the insuring clause that all of the damage from which the loss arises occur instantaneously.